Hillsborough
No. 78-248

THE STATE OF NEW HAMPSHIRE

v.

THOMAS H. THEODOSOPOULOS

August 17, 1979

*Thomas D. Rath*, attorney general (*Peter W. Heed*, assistant attorney general, orally), for the State.

*Wadleigh, Starr, Peters, Dunn & Kohls*, of Manchester (*Eugene M. Van Loan, III* orally), for the defendant.

BROCK, J. This case requires us to consider the constitutionality of a search conducted by the Manchester Police Department after a sniper shot was fired into the Manchester Police Station, seriously wounding two persons. The defendant was indicted on two counts of attempted manslaughter under RSA 630:2, 629:1. In this interlocutory appeal, the defendant excepts to the ruling of the Hillsborough County Superior Court (*Flynn*, J.) denying his motion to suppress physical evidence taken from his apartment and any statements he may have made at the time of the search.

Shortly after midnight on the morning of December 31, 1977, Mrs. Dorothy Perreault came to the Manchester Police Station to complain that her son had threatened her with a gun. At approximately 12:50 a.m., while she was standing at the desk in the lobby talking with police Captain Evangelos P. Xiggoros, a shot was fired. The bullet struck and seriously wounded both Mrs. Perreault and Captain Xiggoros.

The other police officers in the station reacted immediately by turning off all lighting in the building. They summoned several off-duty officers to the station, including a "Special Reaction Team" trained to respond to emergencies such as sniper fire. Because the shot was initially assumed to have been fired from within the station, the officers surrounded the station with patrol cars and uniformed officers, and thoroughly searched the interior of the station. They feared that the unknown assailant, whom they characterized as a sniper, remained positioned to fire additional shots. When Sergeant Louis Durette arrived, at 1:20 a.m., he observed policemen concealed behind cement walls and in doorways, and an officer called out to him, "Sarge, keep down. We don't know where the sniper is."
don't know where the sniper is."

By approximately 1:45 a.m., the interior search was completed and the officers realized that the bullet had in fact come from outside the station. One group of officers then left the station environs to attempt to locate the Perreault boy as a possible suspect. A second group attempted to reconstruct the shooting to determine where the bullet had come from. A large bullet hole was discovered ten or eleven feet above the lobby floor in one of the large panes of glass that form the front wall of the police station facing Chestnut Street. With this new information, Sgt. Durette and the eighteen-man special reaction team first searched a large abandoned church building on the corner of Chestnut and Merrimack Streets, directly across Chestnut Street from the police station. When they found no evidence of the assailant, they returned to the station. Sgt. Durette and two other officers then

lined up the bullet hole in the window with the victims' locations when they had been hit. They concluded that the shot had probably been fired from a row of multi-storied apartment buildings extending westward down Manchester Street from the corner of Chestnut Street. The rear windows and fire escapes of these buildings faced a wide parking area and an alley that separated them from the abandoned church. There was a direct sight line from the front wall of the police station down the alley to the rear windows on the second and third stories of the apartment buildings. The special reaction team immediately began a methodical search of that row of buildings, both rooftops and interiors, beginning with a small store located on the corner closest to the police station. By that time it was about 2:05 a.m., one hour and fifteen minutes after the shot had been fired.

The search of the first few buildings yielded nothing. At about 2:15 a.m., eight officers entered a four-story apartment building at 83 Manchester Street. The ground floor and cellar were found to be clear, and an officer was posted to prevent anyone from leaving the building. The officers awakened the occupant of the second floor apartment, told her that there had been a shooting, and searched her apartment with her consent, without finding any sign of an assailant. She told them that she had not heard any shots or noise from upstairs.

Sgt. Durette and the special reaction team then moved upstairs and pounded on the third-floor apartment door. From under the doorway, they observed that a light was on in the apartment, but heard no noise or response. Sgt. Durette then went down to the second-floor apartment to question its occupant further. According to Sgt. Durette, she told him that the third-floor resident "must be home" because his truck was parked outside. Sgt. Durette returned to the third floor and continued pounding on the door. He sent other members of his team to search the fourth floor and roof. He also communicated with officers at the police station by walkie-talkie and asked that they obtain keys to the third-floor apartment from the owner of the building. One of the special reaction team squads wanted to move on to the next building, but Sgt. Durette was determined to complete the search of that building before moving on.

When the keys arrived, none fit the doors to the third-floor apartment. Sgt. Durette felt that "the whole situation was very grave, ...people's lives were in danger." He kicked open the weakest door and entered the apartment. It was then about 2:50 a.m., two hours after the shooting and about one-half hour after the search had focused on the third-floor apartment.

Once inside the apartment, the officers fanned out, looking for the person who had fired the shot and whom they thought might be

preparing to fire additional shots. Sgt. Durette later testified that he went into the room that had lights on and saw marijuana plants growing in pots on the floor. He proceeded through the kitchen, which faced the alleyway, into a bedroom, also on the alleyway, where he found the defendant, apparently asleep. On a bureau, in plain view, were empty .350 caliber shell casings and a rifle scope. Other officers, looking for a possible second person, entered the bathroom, adjacent to the kitchen and also facing the alleyway, and noticed a broken window from which there was a clear line of sight to the glass wall of the police station where the bullet had entered. The officers, with some difficulty, managed to arouse the defendant and took him to the police station where he was booked for the shooting.

A short while later, at about 6:00 a.m., relying primarily on facts discovered during the initial entry, the police obtained a search warrant from the Manchester District Court (*Capistran*, J.). While executing this warrant, the police thoroughly searched the defendant's truck and apartment, including a locked closet, and found and seized several items, including a pellet rifle, a 16-gauge shotgun, and a .350 caliber rifle. The defendant moved to suppress all physical evidence taken from his apartment and his truck, as well as any statements he might have made during and immediately after the initial search.

■■ . A warrantless search is *per se* unreasonable and invalid, unless it comes within one of a few recognized exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *State v. Thorp*, 116 N.H. 303, 308, 358 A.2d 655, 660 (1976), *citing Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *see* U.S. CONST. amend. IV; N.H. CONST. pt. I, art. 19. We have held that the State has the burden of proving by a preponderance of the evidence that a warrantless search was constitutionally permissible. *State v. Osborne*, 119 N.H. 427, 402 A.2d 493 (1979); *see Arkansas v. Sanders*, 99 S.Ct. 2586 (1979). The recognized exception that the State relies on in this case is that of probable cause to search plus exigent circumstances. *See Warden v. Hayden*, 387 U.S. 294 (1967); *State v. Beede*, 119 N.H. 620, 406 A.2d 125 (1979) (decided this day). The probable cause required for a warrantless search under the exigent circumstances exception is at least as great as that required to support a warrant. *State v. Thorp*, 116 N.H. at 306, 358 A.2d at 658, *citing Wong Sun v. United States*, 371 U.S. 471, 479 (1963); *cf. United States v. Ferrara*, 539 F.2d 799 (1st Cir. 1976) (warrantless search requires more probable cause).

■ In the present case, it is not our task to review the propriety of the entire sweep search conducted by members of the Manchester Police Department or of their search of stores and apartments other than the one occupied by the defendant. *United States v. Scott*, 520 F.2d 697 n.1 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056 (1976). Rather, the issue before us is whether, at the moment the police officers entered the defendant's apartment, they had probable cause to search that particular apartment in connection with the shooting incident. *United States v. Scott supra.* The information gained as a result of the entry cannot, of course, be used to justify the entry itself. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

The defendant correctly points out that, prior to the entry, the State did not have any information linking him personally to the crime that had been committed. This case is therefore different from traditional "hot pursuit" cases in which police officers have some clues to the identity of the person or persons they are chasing. *See, e.g., Warden v. Hayden*, 387 U.S. 294 (1967); *State v. Thorp*, 116 N.H. 303, 358 A.2d 655 (1976). *Compare Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970), *with United States v. Lindsay*, 506 F.2d 166 (D.C. Cir. 1974). In the present case, the determination whether probable cause for the search existed turns on whether, at the time of the entry, the officers reasonably believed that the "thing" sought, the sniper, was located in the place to be entered and searched. *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978); *State v. Doe*, 115 N.H. 682, 685, 371 A.2d 167, 169 (1975); *People v. Superior Court*, 150 Cal. Rptr. 227, 232, 86 Cal. App. 3d 366, 373 (1978); *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, *cert. denied*, 426 U.S. 953 (1976); Grimes, *Probable Cause in the Zurcher Case*, 17 Judges' Journal 25 (1978).

■ The record shows that the officers had calculated the bullet trajectory sufficiently to focus their search on a particular row of buildings along Manchester Street. By the time they reached the defendant's apartment, they had searched a significant number of these buildings and had secured those buildings which were closer to the police station than the defendant's. *Cf. People v. Bradford*, 28 Cal. App. 3d 695, 104 Cal. Rptr. 852 (1972) (apartment house); *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, *cert. denied*, 426 U.S. 953 (1976) (hotel). The defendant's apartment was on the third floor, at a height compatible with the bullet path. Lights were on in the apartment and the defendant's truck was parked outside, leading the officers to believe that the apartment was occupied. When no one responded to their persistent knocking, they had reason to conclude that the occupant wished to conceal his

580

presence. *United States v. Scott*, 520 F.2d 697, 700 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056 (1976). The evidence supports the trial court's finding that the State had sufficient probable cause to search the defendant's apartment.

■ Probable cause alone, however, is not sufficient to justify the search conducted in this case. *See State v. Beede*, 119 N.H. 620, 406 A.2d 125 (1979) (decided this day). Ordinarily, any search must be performed pursuant to a judicially-issued search warrant. *Arkansas v. Sanders*, 99 S.Ct. 2586 (1979). The warrant requirement is particularly stringent for a search of a private dwelling, in which the occupant has a strong expectation of privacy and protection from government intrusion. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976); *State v. Beede supra*.

Nevertheless, exigent circumstances may justify a warrantless search where there is a compelling need for immediate official action and a risk that the delay inherent in obtaining a warrant will present a substantial threat of imminent danger to life or public safety. *See Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967); *State v. Slade*, 116 N.H. 436, 362 A.2d 194 (1976); Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement under the Fourth Amendment*, 22 Buffalo L. Rev. 419, 426 (1973).

■■ By statute and at common law, police officers have a duty to act as "conservators of the peace." RSA 105:3; *Blais v. Town of Goffstown*, 119 N.H. 613, 406 A.2d 295 (1979) (decided this day); *State v. Grant*, 107 N.H. 1, 2, 216 A.2d 790, 791 (1966). As such, they have the right, and in some circumstances, the obligation, to act expeditiously to protect the public from an armed person, known to be at large, who has just shot and wounded two other persons. *See generally Mincey v. Arizona*, 437 U.S. at 392; *United States v. Barone*, 330 F.2d 543, 545 (2d Cir. 1964), *cert. denied*, 377 U.S. 1004 (1964); Mascolo, *supra* at 426; Note, 43 Fordham L. Rev. 571, 582 (1975). Whether a situation is sufficiently urgent to permit a warrantless search depends on the totality of the circumstances. *United States v. Evans*, 481 F.2d 990, 993 (9th Cir. 1973); *State v. Mollberg*, 310 Minn. 376, 246 N.W.2d 463 (1976). Even if it can be shown after the fact that no emergency existed, the warrantless entry may be sustained as long as the officers' perception of the emergency was reasonably grounded in the facts known to them at the time. Mascolo, *supra* at 427 n.33.

■ The record sustains the trial court's finding that a "highly volatile" emergency existed that justified the police entry into the

defendant's apartment. A shot fired into the police station at midnight led the police to believe that there was a sniper at large in the immediate vicinity of the police station. Deputy Chief of Police Edmund LeBoeuf, who arrived at the station at 1:20 a.m., testified that the officers "knew a shot was fired and a couple people had been hit. They . . . expected almost anything . . . another shot." They knew that finding a magistrate and obtaining a warrant in the middle of the night could easily take an hour or two. *See* N.H. Attorney General, Law Enforcement Manual, ch. 7, § 8, at 52 (1972).

 At some point, the passage of time during which a warrant could have been obtained destroys the State's claim of exigency. *See, e.g., Michigan v. Tyler*, 436 U.S. 499 (1978) (several days); *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 358–92 (1977) (several days); *State v. Beede supra* (two days), *People v. Hampton*, 587 P.2d 275 (Colo. 1978) (40 hours). "[T]he presence or absence of an ample opportunity for getting a search warrant" is a relevant factor in considering the reasonableness of any warrantless search. *United States v. Rabinowitz*, 339 U.S. 56, 84 (1950) (Frankfurter, J., dissenting); *see McDonald v. United States*, 335 U.S. 451, 455 (1948). On the other hand, police officers responding to an emergency are not required to initiate a search or arrest at the first moment that probable cause exists. *United States v. Weinrich*, 586 F.2d 481, 493 (5th Cir. 1978).

 In the instant case, the defendant's apartment was searched approximately two hours after the shooting incident, and about one-half hour after the police had sufficient information to constitute probable cause. That delay did not, in and of itself, destroy the emergency and render the search "unreasonable" under the fourth amendment. *See United States v. Simmons*, 444 F. Supp. 500, 506 (E.D. Pa. 1978), *aff'd*, 591 F.2d 206 (3d Cir. 1979) (search sustainable even though considerable time had elapsed since onset of exigent circumstances). The police activity here was a methodical, continuous, and vigorous attempt to apprehend an armed and dangerous person. *See People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976), *cert. denied*, 426 U.S. 953 (1976). There is no suggestion that the emergency was artificially created by the State's own action or inaction. *See* Williamson, *The Supreme Court, Warrantless Searches, and Exigent Circumstances*, 31 Okla. L. Rev. 110, 123 (1978). Nor are there facts tending to show that the State's failure to obtain a warrant reflected an absence of concern for protecting fourth amendment values. *See McDonald v. United States*, 335 U.S. 451, 455 (1948);

*United States v. Brightwell,* 563 F.2d 569, 576 (3d Cir. 1977) (Lord, J., dissenting). The constitutionality of a given search does not turn on this court's after-the-fact evaluation of whether, as a tactical matter, the police could have deployed their forces differently in response to a confusing emergency situation. *United States v. Weinrich,* 586 F.2d at 494 (1978). We affirm the trial court's ruling that the warrantless entry into the defendant's apartment was both supported by probable cause and justified by a life-endangering emergency created by sniper fire.

The defendant further contends that even if the initial entry was justified, the subsequent search of his apartment exceeded its permissible scope. *See United States v. Goldenstein,* 456 F.2d 1006 (8th Cir. 1972), *cert. denied* 416 U.S. 943 (1974); *State v. Slade,* 116 N.H. 436, 362 A.2d 194 (1976). In particular, he challenges the admissibility of a spent shell found in the living room and the broken bathroom window.

The emergency doctrine cannot be used to justify a search primarily directed towards gathering evidence of past criminal activity, no matter how violent the crime. *Mincey v. Arizona,* 437 U.S. 385 (1978); *Michigan v. Tyler,* 436 U.S. 499 (1978); *People v. Mitchell,* 39 N.Y.2d 173, 383 N.Y.S. 2d 246, 347 N.E.2d 607 (1976), *cert. denied,* 426 U.S. 953 (1976). An emergency search is "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona,* 437 U.S. at 393, *quoting Terry v. Ohio,* 392 U.S. 1, 25–26 (1968). Once inside the apartment, however, the officers were authorized to conduct a limited search confined to what was reasonably necessary for the purpose of the entry. *State v. Slade,* 116 N.H. at 438, 362 A.2d at 196. Because the officers did not know the identity or the number of persons involved in the shooting, it was reasonable for them to look for one or more persons, as well as for weapons, in all the rooms of the apartment, especially those with windows facing the alleyway and the police station. *See People v. Olajos,* 397 Mich. 629, 246 N.W.2d 828 (1976); *State v. Max,* 263 N.W.2d 685 (S.D. 1978). Once in those rooms, they were not required to close their eyes to items of apparent evidentiary value that confirmed the link between the defendant and the shooting. *See Coolidge v. New Hampshire,* 403 U.S. 443, 468 (1971); *Warden v. Hayden,* 387 U.S. 294, 300–01 (1967); *State v. Hardin,* 90 Nev. 10, 15, 518 P.2d 151, 154 (1974); Mascolo, *supra* at 426–27.

Pursuant to a warrant supported by an affidavit relying on information gained during the warrantless entry, the officers searched the defendant's truck and apartment, and seized weapons, live and expended ammunition, and marijuana. These items are

admissible because the initial warrantless entry was not constitutionally invalid. *State v. Osborne*, 119 N.H. 427, 402 A.2d 493, 496 (1979), *citing Wong Sun v. United States*, 371 U.S. 471 (1963). The trial court did not err in denying the defendant's motion to suppress this evidence.

The defendant also seeks to exclude "any and all statements... issued by the defendant contemporaneous or subsequent to the entry of his apartment," on the ground that these statements, as well as the physical evidence, were tainted by the illegal search.

Since we uphold the constitutionality of the search, it provides no basis for suppressing such statements. *See State v. Beaulieu*, 119 N.H. 400, 402 A.2d 178 (1979). Furthermore, the record before us fails to indicate that the defendant ever made any statements "contemporaneous or subsequent to the entry of his apartment." Notwithstanding the provisions of Rule 98 (now Rule 99) of the Rules of the Superior Court, neither counsel was able to represent at oral argument that any such statements actually exist.

On this interlocutory appeal, we refuse to speculate either as to the existence of such statements or as to bases for their suppression other than the claim here that the search was illegal.

*Exceptions overruled; remanded.*

All concurred.