Grafton
No. 79-054

THE STATE OF NEW HAMPSHIRE

v.

WILLIAM R. BEEDE

August 17, 1979

622

*Thomas D. Rath*, attorney general (*Anne E. Cagwin*, assistant attorney general, orally), for the State.

*Stebbins & Bradley*, of Hanover (*John S. Stebbins* orally), for the defendant.

GRIMES, J. The defendant was convicted of second-degree murder, RSA 630:1-b(I)(a), on December 15, 1978. The case comes to this court on issues of suppression of evidence of the victim's body and other evidence, and impeachment of the defendant's credibility by evidence of prior convictions. We hold that the trial court correctly refused to suppress the physical and testimonial evidence complained of, and properly ruled that a defendant who chooses to take the witness stand may, within the bounds of judicial discretion, be cross-examined as to prior valid convictions bearing upon his credibility.

Miss Lemay had been reported missing by her family on Monday, June 5, at approximately 11:30 p.m. Starting an immediate search in

the area of High Street, Officer Roberts of the Lebanon Police Department questioned two women, Rose Coleman and Noella LaJoie, and learned that they had seen Miss Lemay at approximately 5:30 p.m., walking with the defendant towards the defendant's apartment on Hanover Street. Roberts then went to the defendant's apartment and, identifying himself as a police officer, knocked several times on the door. Although he heard a noise inside "like somebody stumbl[ing] over something," no one responded. Roberts inquired of several of the neighbors in the building and one Irene Williams told him that she too "had heard someone in the apartment." Roberts' repeated requests for the defendant to answer the door proved unfruitful.

The following day, June 6, 1978, Detective Jerry Whitney took over the search. After reading the report of the previous night's events, he went to the defendant's apartment, knocked on his door several times without success, and talked with the neighbors. Whitney learned from Miss Lemay's mother that Miss Lemay was fifty-six years old and retarded, that she was not competent to live by herself, and that she had a seizure-type disease but could not take care of herself should a seizure strike because her medication was with the mother. He was also told that Miss Lemay would sometimes hide from her mother at the onset of a seizure, that she had a drinking problem, and that she had never before stayed away from home overnight.

On Wednesday, June 7, 1978, Detective Whitney resumed the investigation. Between 4 and 5 p.m., he went to the defendant's apartment and knocked on the door several times. He then decided to contact the defendant's landlord and succeeded in doing so at 9:30 that evening. Shortly thereafter, the building custodian arrived with the key to the apartment. Before using the key, Detective Whitney attempted once again to secure admittance to the apartment by knocking on the door. He also spoke once more with tenant Irene Williams to determine if the defendant had returned or if any noises had been heard coming from the defendant's apartment. She had not seen or heard anything. Whitney then had the custodian open defendant's door with the passkey. The door, however, opened only some three to four inches before being stopped by a night chain. They then decided to try an alternative means of entrance to the apartment by way of an adjoining building and across defendant's back porch. Detective Whitney contacted Officer Robbins and asked him to proceed to the apartment to assist in the investigation.

While awaiting Officer Robbins' arrival, Detective Whitney opened the defendant's kitchen window and called out defendant's name several times, but he heard no response. He flashed the beam of his flashlight inside the darkened room, but saw no sign of the defendant

or Miss Lemay. The custodian then informed Detective Whitney that when the defendant's door had initially been opened, he thought he had smelled "an odor," and that when the kitchen window had been opened, he was sure he smelled an odor. Officer Robbins arrived and, without having obtained a search warrant, the three men entered the apartment through the kitchen window.

In a cursory search of the apartment, they found Miss Lemay's body lying naked on a bed in the defendant's bedroom. The officers left the apartment to secure a search warrant.

A full homicide investigation was instituted upon the issuance of a search warrant. The forensic team collected photographic evidence and dusted the apartment for fingerprints. From Leland Cargill, a neighbor residing in an apartment adjacent to the defendant's back porch, the police learned that the defendant had spent the night of Monday, June 5, 1978, on a couch in the Cargill apartment and that when the defendant had arrived at around 12:30 a.m., June 6, he had told Cargill that there was a woman in his apartment who was bleeding at the mouth and was black and blue about the throat. Cargill had not telephoned the police, however, because he "didn't really believe [the defendant] done [sic] anything." Defendant was arrested in Boston, Massachusetts on July 1, 1978.

After being advised of his rights, defendant gave two different accounts of the events of Monday, June 5, 1978. In one of the statements, the defendant stated that he had been with the victim in the apartment, that he had lain down on the bed with her, that she had taken her clothes off, and that at some point, he put his hand on her neck and choked her. The voluntariness of the statements is not an issue before this court.

An autopsy revealed that the victim died from strangulation. The pathologist's report reveals that the victim's neck was severely bruised, that her hyoid bone was both broken and dislocated, and that the actual cause of death was lack of oxygen to the brain.

The defendant was indicted by the Grafton County Grand Jury for second-degree murder, RSA 630:1-b(I)(a), and entered a plea of not guilty at arraignment. On December 6, 1978, a hearing was held on the defendant's motion to suppress the physical and testimonial evidence against him. The court denied the motion, and on December 11, 1978, empanelled a jury and began the trial.

Prior to the close of the State's case-in-chief, the court conducted a hearing on the admissibility of the defendant's prior conviction for impeachment purposes. The court ruled over exception that two convictions, one a 1973 New Hampshire conviction for obtaining property by false pretenses, the other a 1972 New Hampshire

conviction for cashing a check with intent to defraud a bank, could be used to impeach the defendant's credibility. The defendant took the stand during the presentation of his case and the prior convictions were brought to the jury's attention during his direct examination. The court properly gave a limiting instruction to the jury both at that time and again during the final charge. The jury's verdict of guilty was entered and *Johnson*, J., transferred defendant's exceptions.

The first issue presented is whether the defendant is entitled to a new trial because of the court's ruling regarding the introduction of the prior convictions. The essence of defendant's position is that by permitting cross-examination regarding prior offenses the court imposed an unconstitutional restraint on his right to testify. *See State of Hawaii v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971). The law in this State, however, is decidedly to the contrary. Subject to the exercise of judicial discretion, "evidence of a defendant's prior convictions is admissible . . . 'when the defendant has raised the issue of his character . . . or when the defendant has testified and the State seeks to impeach his credibility.'" *State v. Lavallee*, 119 N.H. 207, 210, 400 A.2d 480, 483 (1979), *quoting State v. Cote*, 108 N.H. 290, 294, 235 A.2d 111, 114, *cert. denied*, 390 U.S. 1025 (1967).

The prior convictions introduced with a limiting instruction in the present case directly pertained to defendant's veracity. We hold that the trial court acted well within its discretion in admitting, for the limited purpose of impeachment, two of defendant's prior convictions.

The second issue presented is whether the trial court erred in ruling adversely on defendant's motion to suppress the bulk of the evidence against him. Defendant contends that the warrantless search of his apartment was illegal under both the Federal and New Hampshire Constitutions, U.S. CONST. amend. IV; N.H. CONST. pt. I, art. 19, and that consequently, any evidence seized directly or derivatively from that search should not have been admitted against him at trial.

[3, 4] The initial entry into the apartment was made without a warrant. Defendant correctly asserts that warrantless searches "are *per se* unreasonable" under both the fourth amendment and N.H. CONST. pt. I, art. 19, and that to justify such a search, the State has the burden of showing that it comes within one of the exceptions to the warrant requirement. *State v. Theodosopoulos*, 119 N.H. 573, 409 A.2d 1134 (1979), *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *see Mincey v. Arizona*, 437 U.S. 385 (1978); *State v. Slade*, 116 N.H. 436, 437–38, 362 A.2d 194, 195 (1976). It is also true that the warrant

requirement applies to both criminal and noncriminal searches. *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978). The fourth amendment requirements and those of N.H. Const. pt. I, art. 19 apply whether the officer conducting the search is looking for a missing person or for evidence of a crime. *See Camara v. Municipal Court*, 387 U.S. 523, 528–29 (1967); *State v. Slade supra.*

■■ The landlord, of course, had no authority to consent to the warrantless search of defendant's apartment. *Chapman v. United States*, 365 U.S. 610 (1961). Thus, the only exception to the requirement of a warrant that is, or could be, relied upon in this case is referred to by the State as the "emergency" exception. This exception is more properly defined, however, as probable cause plus exigent circumstances, *United States v. Chadwick*, 433 U.S. 1 (1977), and requires the existence of both probable cause and exigent circumstances. *State v. Slade*, 116 N.H. at 437–38, 362 A.2d at 195. There must be a reasonable basis for the search, and the exigent or emergency situation must make it reasonable to act without a warrant. Probable cause, however, must always precede a search, and although under this exception the establishment of probable cause before a judicial officer need not precede the search by obtaining a warrant, probable cause must, when challenged, be shown, after the search, to have existed before the search.

■ In a noncriminal search, which the defendant claims and we agree was the type of search involved here, the probable cause requirement is not directed toward the probability of finding fruits, implements, or evidence of a crime. Rather, the requirement is directed toward whether the facts and circumstances within the officer's knowledge, and of which he had reasonably trustworthy information, would warrant the person of ordinary caution in the belief that it would be appropriate to make the search for the noncriminal purpose. *Michigan v. Tyler*, 436 U.S. 499 (1978); *see Cady v. Dombrowski*, 413 U.S. 433 (1973); *Terry v. Ohio*, 392 U.S. 1 (1968).

■ When the police are not seeking things or evidence relating to a criminal case but instead are seeking to inspect for compliance with governmental regulations, *Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978), or to see if a person is injured and in need of assistance, *Mincey v. Arizona*, 437 U.S. 385 (1978); *State v. Slade*, 116 N.H. 436, 362 A.2d 194 (1976), or as in this case to find a missing person who may be in need of assistance, it is not necessary that the officer be in possession of facts that would warrant the belief that what is sought will be found (as is required in a criminal case). It is only necessary that the facts

would warrant the belief that it is appropriate to look to see if there is evidence which would lead to the missing person. *Camara v. Municipal* Court, 387 U.S. 523 (1967).

■ The State contends that the officer in this case was in doubt whether the facts and circumstances would support the issuance of a warrant, and that therefore he was justified in an emergency in entering without one. No such exception exists. Every emergency entry must be justified by articulable facts which would have supported the issuance of a warrant based on the existence of probable cause for the search. *See State v. Slade*, 116 N.H. 436, 362 A.2d 194 (1976).

Even *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, *cert. denied*, 426 U.S. 953 (1976), relied upon by the State, requires that there be reasonable grounds or a reasonable basis approximating probable cause to associate the emergency with the place to be entered. *Id.* at 177, 383 N.Y.S.2d at 248, 347 N.E.2d at 609. Police are strongly urged not to act without a warrant when they doubt they have a basis to obtain one. If, in fact, there were no basis for the search, then it will be ruled invalid anyway, unless it can be justified under one of the other exceptions to the warrant requirement. If there is time to get a warrant, it is the only safe way to proceed.

We are satisfied that the facts and circumstances would have supported the issuance of a warrant in this case. They were such as would have justified a person of ordinary caution in the belief that it would be reasonable to enter for the noncriminal purpose of looking for the defendant or Miss Lemay. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978); *Cady v. Dombrowski*, 413 U.S. 433 (1973); *Terry v. Ohio*, 392 U.S. 1 (1968); *State v. Slade*, 116 N.H. 436, 362 A.2d 194 (1976).

■ Even though we find that probable cause for a noncriminal search existed in this case, we are still faced with the exigency or emergency requirement, because no amount of probable cause will justify dispensing with a warrant unless there are exigent circumstances. *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); *Vale v. Louisiana*, 399 U.S. 30 (1970). The State argues that the fact that the victim was subject to seizures, did not have her medicine with her, and was retarded and incapable of living by herself created exigent circumstances justifying the warrantless entry.

■ Defendant, on the other hand, points to the fact that the police waited from 11:30 p.m., on June 5, until about 4 to 5 p.m., on June 7,

before deciding to enter the apartment, and that even then, they sought out the landlord to open the apartment and not a judge to obtain a warrant. They then waited until 9:30 that night before the landlord was located. Sometime after that the custodian came with the key. Even then the officer sent for and waited for another officer before entering. Although it is true that exigencies may suddenly arise after the passage of time, *Cardwell v. Lewis*, 417 U.S. 583 (1974), it is also true that exigent circumstances can disappear with the passage of time. *United States v. Chadwick*, 433 U.S. 1 (1977); *G. M. Leasing Corp. v. United States*, 429 U.S. 338 (1977); *cf. State v. Theodosopoulos*, 119 N.H. 573, 409 A.2d 1134 (1979). In assessing these factors, it must be remembered that the entry here was into the privacy of the home and not into an automobile. *See United States v. Chadwick supra.*

What was said by Mr. Justice Jackson over thirty years ago bears repeating:

> An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine "the right of the people to be secure in their persons, houses, papers, and effects," and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.

*Johnson v. United States*, 333 U.S. 10, 17 (1948) (footnote omitted).

And Mr. Justice Douglas' words of the same time should always be remembered:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek

exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States*, 335 U.S. 451, 455–56 (1948).

■ The action of the police in this case was not consistent with an emergency situation which made entry without a warrant "imperative." They had as much information to justify the issuance of a warrant on June 6 as they did on June 7, and yet no effort was made to obtain one. Even after a decision was made on June 7 between four and five in the afternoon that an entry would be made, they delayed for at least four-and-one-half hours and probably as long as five-and-one-half to six hours before entering. We must conclude that no exigent circumstances existed which would excuse a search without a warrant under N.H. Const. pt. I, art. 19.

This does not mean that the exclusionary rule requires the suppression of the evidence under the precise facts of this case. The victim's body was found in an apartment building. The weather at the time was warm. Already, after only two days, the odor of decaying flesh had permeated the apartment. It would not have been long before the odor would have spread to the adjoining apartments which would inevitably have led to the discovery of the body. The police would then be in possession of the same information which they in this case obtained as a result of an invalid search. It would serve no useful purpose under the circumstances of this case therefore to exclude the evidence of the body being in defendant's apartment.

Our ruling may be likened to the "inevitable discovery rule" applied by some courts. *See, e.g., Brewer v. Williams*, 430 U.S. 387, 406–07 n. 12 (1977); *Killough v. United States*, 336 F.2d 929, 934 (D.C. Cir. 1964). *See also* Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 COLUM. L. REV. 88, 91 (1974). Defendant correctly points out that in *Crews v. United States*, 389 A.2d 277 (D.C. Cir. 1978), *cert. granted,* 99 S.Ct. 1213 (1979), a majority of the Court of Appeals for the District of Columbia rejected the inevitable discovery rule where an in-court identification was arguably obtained by exploitation of the defendant's illegal arrest, reasoning that it would allow the police to make "end runs and shortcuts" around the fourth amendment. *Id.* at 293. The rationale of that case does not apply under the special circumstances of this case, and we do not hold that we would adopt the rule in all situations. But where, as here, the body was bound to be discovered without police involvement, we believe it would not serve the ends of justice to exclude the fact that it was found in the defendant's apartment. The police, however, are admonished

not to rely upon this rule. Although we rely upon it in the narrow circumstances of this case, we are not adopting it as a blanket rule to allow the police to show that they themselves would have discovered it by legal means where discovery would require them to enter into private premises.

█ Once the body was found by private persons and reported to the police, the same events which followed the discovery on June 7 would surely have taken place. There would have been photographs, an autopsy, and interrogation of the same witnesses. There was nothing found in the apartment which in any way pointed to the whereabouts of the defendant. The evidence at trial would not have been significantly different than it was. We hold, therefore, that there was no error in the denial of defendant's motion to suppress.

*Exceptions overruled.*

BOIS, J., concurs in the result; the others concurred.