Rockingham
No. 82-028

# THE STATE OF NEW HAMPSHIRE

v.

## CARL H. SMITH, II

January 24, 1983

*Gregory H. Smith,* attorney general (*Martha V. Gordon,* assistant attorney general, on the brief and orally), for the State.

*James E. Duggan,* appellate defender, of Concord, by brief and orally, for the defendant.

BOIS, J. The defendant, Carl H. Smith, II, appeals from a jury verdict in which he was found guilty of second-degree murder under RSA 630:1-b. His primary argument relates to the propriety of the Trial Court's (*Bean,* J.) instruction on manslaughter. We affirm his conviction.

The events giving rise to the indictment and prosecution of the defendant occurred at an after-hours "juice bar" in Portsmouth. On September 6, 1980, the defendant arrived at the bar with his girlfriend at approximately 1:00 a.m. After paying the cover charge and entering the club, he remained inside for a short period and then went outside to smoke marijuana with a friend. When the defendant returned to the bar, the doorman, Russell Armstrong, asked to see his ticket, and an argument ensued. The individuals began to fight, and the defendant brandished a knife and stabbed Armstrong several times. Armstrong later died from the wounds inflicted.

The defendant was indicted for first-degree murder, and a lengthy bifurcated trial was held to determine whether he was

guilty and, if so, whether he was sane. At the close of the evidence in the guilt phase of the trial, the presiding judge charged the jury on first-degree murder and the lesser-included offenses of second-degree murder and manslaughter. These instructions were subsequently repeated at the request of the jury. The defendant was found guilty of second-degree murder and sane, and he initiated this appeal.

The defendant focuses his argument on the trial judge's instruction on manslaughter. The instruction, to which the defendant properly objected and excepted when it was given for the second time, provided as follows:

"The line which distinguishes provocation which will mitigate the offense from murder to manslaughter cannot be clearly defined. Reasonableness is the test. The law requires that provocation to be such as might induce such a man, in the anger of the moment, to commit such an act. Lawful behavior on the part of the victim cannot serve as a trigger for legally sufficient provocation. *A lawful act, even if it involves physical violence, is not recognized by the law as a sufficient provocation.* Thus, the provocation must itself be an unlawful act."

(Emphasis added.) The defendant specifically challenges the judge's instruction that a lawful act could not constitute sufficient provocation to mitigate the offense from murder to manslaughter. The underlying premise of his argument is that Armstrong acted lawfully in using non-deadly force to prevent what was reasonably believed to be a criminal trespass. *See* RSA 627:7. The defendant claims that such lawful conduct could result in adequate provocation under the manslaughter statute, RSA 630:2 (Supp. 1981), and that the instruction therefore was reversible error.

The manslaughter statute, *id.*, provides in pertinent part:

"A person is guilty of manslaughter when he causes the death of another . . . [u]nder the influence of extreme mental or emotional disturbance *caused by extreme provocation.* . . ."

(Emphasis added.) Neither the legislative history of the statute, nor our case law, offers any guidance as to the specific types of conduct that will constitute "extreme provocation" under the statute.

█ █ It is generally recognized that provocation is adequate to reduce a homicide from murder to manslaughter only if it would cause a reasonable person to kill another out of passion. *See* W. LaFave & A. Scott, Handbook on Criminal Law § 76, at 573

(1972); 2 WHARTON'S CRIMINAL LAW § 155, at 241–42 (14th ed. C. Torcia 1979); *See, e.g., People v. Simpson*, 74 Ill. 2d 497, 503, 384 N.E. 2d 373, 374 (1979). Virtually all the acts that have been found to constitute adequate provocation have involved unlawful conduct, such as assault, battery, illegal arrest, adultery and mutual combat. *See People v. Miller*, 96 Ill. App. 3d 212, 214, 421 N.E.2d 406, 408 (1981); W. LAFAVE & A. SCOTT *supra* § 76, at 574–76; *See, e.g., Denham v. State*, 218 Miss. 423, 429, 67 So. 2d 445, 447–48 (1953) (adultery); *State v. Conley*, 255 Mo. 185, 200–01, 164 S.W. 193, 198 (1914) (assault).

Moreover, several courts have expressly ruled that the exercise of a legal right cannot provide sufficient provocation to reduce the grade of a homicide. *See State v. Manus*, 93 N.M. 95, 100, 597 P.2d 280, 285 (1979) (citing *State v. Lawry*, 4 Nev. 161, 170 (1868); *State v. Craton*, 28 N.C. (6 Ired. L.) 164, 174 (1845)). This view is consistent with the common law. *See* W. LAFAVE & A. SCOTT *supra* § 76, at 574–76.

■ In support of his claim that lawful acts may constitute adequate provocation, the defendant argues that acts committed during mutual combat have often been held to constitute sufficient provocation for a finding of manslaughter. This argument is not persuasive because it fails to recognize that the acts which have resulted in sufficient provocation in mutual combat cases have generally been unlawful in themselves. *See, e.g., State v. Fuller*, 302 S.W.2d 906, 908 (Mo. 1957); *cf. Commonwealth v. Collberg*, 119 Mass. 350, 353 (1876) (blows during fight by mutual consent constitute assault); RSA 631:2-a (Supp. 1981) (harmful acts during fight entered by mutual consent treated as violations).

■ ■ While it is true that some courts have held that words alone, and thus potentially lawful conduct, may provide adequate provocation, *see, e.g., People v. Wickersham*, 177 Cal. Rptr. 559, 563 (Cal. App. 1981); *State v. Carson*, 640 P.2d 586, 590 (1982), we decline to follow such an approach. Considering the common-law rule which measures provocation under a reasonable-person standard, and the requirement under our manslaughter statute that the provocation be "extreme," we hold that a lawful act cannot provide sufficient provocation to support a finding of manslaughter. The trial court's instruction in this case therefore was proper.

The defendant's second argument concerns the permissibility of certain questions which the State posed to him on cross-examination. Before the defendant took the stand, several witnesses testified that during the altercation with Armstrong, the defendant, who had sustained a minor cut, made statements tending to incriminate himself,

such as "I'm going to get that m----- f-----" and "I'll teach him [Armstrong] not to cut me again." When the defendant, on cross-examination, testified that he did not remember making these statements, the prosecution asked him what he thought these statements would have meant if he had made them. The trial court permitted this line of questioning over the defendant's objections and exceptions, and the defendant now challenges the court's ruling. He claims that the questions were unduly argumentative.

■ While we recognize that the trial court has broad discretion in defining the scope of cross-examination, *State v. Glidden*, 122 N.H. 41, 47, 441 A.2d 728, 731 (1982), we agree with the defendant that the questioning in this case as to his interpretation of unacknowledged statements was inappropriate. The questions dealt with speculative matters and were not calculated to impeach the witness. *See* 2 WHARTON'S CRIMINAL EVIDENCE § 427, at 339–40 (13th ed. C. Torcia 1972). Nevertheless, the State's questioning did not elicit any prejudicial responses from the defendant; the responses merely provided self-evident explanations of the purported statements. Thus, we conclude that the allowance of such inquiries does not warrant a new trial. *Cf. State v. Duke*, 358 So. 2d 293, 295 (La. 1978) (improper question on cross-examination does not require reversal); *State v. Watts*, 639 P.2d 158, 161 (Utah 1981) (improper impeachment not prejudicial).

The defendant next argues that the trial court committed reversible error when it refused, after the completion of the guilt phase of the trial, to voir dire the jury members as to whether they had any prejudice regarding the insanity defense. We find no merit to this argument.

■ A trial judge has broad discretion in deciding whether to voir dire the jury on a given subject. *State v. Danskin*, 122 N.H. 817, 819, 451 A.2d 396, 398 (1982); *State v. Weitzman*, 121 N.H. 83, 87–88, 427 A.2d 3, 6 (1981). Here, the defendant knew at the outset that a second stage of the trial, on the issue of his sanity, would take place if he were found guilty. When the jury was *first* selected, the defendant made requests for voir dire on various matters. Nevertheless, he failed to request voir dire on the insanity defense at that time, but instead waited until after the completion of the guilt phase.

Under our decision in *Novosel v. Helgemoe*, 118 N.H. 115, 124–25, 384 A.2d 124, 130 (1978), the defendant had a choice to bifurcate the trial or to join the not-guilty plea with the insanity defense in a single proceeding. One could not choose to bifurcate and then at the sanity phase have a new voir dire of the jurors without running the

risk of losing the required twelve-person jury. *See Opinion of the Justices*, 41 N.H. 550, 552 (1860). Of course, if a defendant were to knowingly waive the requirement of twelve jurors, *see Opinion of the Justices*, 121 N.H. 480, 483–84, 431 A.2d 135, 137 (1981), and expressly agree that his case may be decided by whatever number of jurors remain unexcused, then a separate voir dire between the guilt and insanity phase would not present a problem.

In this case, however, defendant did not indicate a willingness to waive the requirement of twelve jurors when the trial judge gave him that opportunity at the time of the request for additional voir dire. In light of this fact, unnecessary duplication of the original selection procedures could not be foreclosed. Thus, a request at the outset of the trial would have been preferable because it would have insured the continuity of the jury proceedings. Voir dire on the insanity defense, moreover, could have been conducted in a discreet manner at the start of the trial so as to have avoided putting the jurors on notice that the defendant planned to raise the defense. *See Novosel v. Helgemoe*, 118 N.H. at 123–25, 384 A.2d at 129–30.

■ In addition, the defendant did not allege that any circumstances arising after the start of the trial had alerted him to the possibility of actual prejudice on the part of the jury members. Consequently, we hold that the trial court, in its sound discretion, could properly have denied the defendant's request for voir dire on the insanity defense. We further note that the trial judge reduced the likelihood of any potential prejudice by admonishing the jury that it was not to base its decision on the sanity issue upon any bias or prejudice.

■ In his final argument, the defendant asks us to reconsider our decisions in *State v. Laroche*, 122 N.H. 231, 234, 442 A.2d 602, 604 (1982); *State v. Reardon*, 121 N.H. 604, 605, 431 A.2d 796, 797 (1981); and *State v. Elbert*, 121 N.H. 43, 47–48, 424 A.2d 1147, 1150 (1981), wherein we addressed challenges to the jury selection process. The defendant sets forth no new or persuasive reasons for overturning these decisions, and we decline to do so.

*Affirmed.*

All concurred.