Rockingham
No. 81-395

## THE STATE OF NEW HAMPSHIRE

v.

## EDGAR HOLLER

March 28, 1983

196

*Gregory H. Smith*, attorney general (*Paul Barbadoro* and *Richard C. Nelson*, assistant attorneys general, on the brief, and *Mr. Barbadoro* orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

BOIS, J. The defendant, Edgar Holler, was indicted for the second-degree murder of his wife. Following a bifurcated jury trial in Superior Court (*Wyman*, J.), he was found to have been sane and

guilty of manslaughter. *Novosel v. Helgemoe*, 118 N.H. 115, 125, 384 A.2d 124, 130 (1978). He appeals his conviction on the following grounds: (1) that the gun used in the killing was the fruit of an illegal interrogation and search, and therefore it was improperly admitted into evidence at trial; (2) that the trial court erred in failing to conduct a separate voir dire of the jurors prior to the sanity phase of the trial; (3) that the trial court erred in failing to reinstruct the jury on the consequences of an insanity verdict; and (4) that the method of selecting the grand jury was inherently discriminatory. We reject these arguments and affirm the defendant's conviction.

At approximately 10:00 a.m. on September 9, 1981, the Raymond police received a telephone call from Louise Monroe, who reported that her father, Edgar Holler, had just come to her home and told her that he had killed her mother earlier that morning. Mrs. Monroe informed the police that the defendant had since left her home, and she provided them with a description of the vehicle that he was driving. Immediately thereafter, the Raymond police chief proceeded to the Holler residence, where he found Mrs. Shirley Holler in the kitchen, dead of gunshot wounds. The chief alerted the State and local police and checked the house for other occupants. When no one else was found in the house, he secured the premises.

The defendant was stopped while driving along Route 101 in Raymond at approximately 11:00 a.m., and arrested. He appeared highly intoxicated. The arresting officer advised the defendant of his *Miranda* rights and took him directly to the Raymond police station. During the ride to the station, the defendant voluntarily told the officer that he had shot his wife.

Shortly after 11:00 a.m., the arresting officer arrived with the defendant at the Raymond police station, and Lieutenant Donald Buxton of the New Hampshire State Police advised the defendant of his rights for the second time. When Lieutenant Buxton asked the defendant whether he wished to waive his rights, the defendant responded that he did not. The defendant then added: "But let me tell you, I killed Shirley because I loved her more than life itself." After making several other unsolicited incriminating statements, the defendant asked for Attorney Gordon Snyder. The police telephoned Attorney Snyder, who requested that they not question the defendant. Lieutenant Buxton then departed to obtain a warrant to search the Holler residence and vehicle.

Prior to the arrival of his attorney, the defendant remained with several officers, including Corporal Arthur Wiggin of the State Police. The testimony was conflicting as to what transpired during this period. Corporal Wiggin testified that the defendant asked what

would happen next, and was told that the police were obtaining a warrant to search his house and vehicle for the gun. Wiggin further testified that the defendant had stated *sua sponte* that the police would never find the gun and he would not tell them where it was, but that he would show them. This testimony, however, conflicted with that of Trooper Stanley Richardson, who was also present at the time. Richardson stated that Corporal Wiggin initiated the conversation by asking the defendant where the weapon was, and that in response the defendant agreed to show the police the location of the gun.

As a consequence of the conversation with the defendant, Wiggin and another officer took the defendant to his residence, where they met Captain Roger Beaudoin of the State crime laboratory. Together, they entered the house, without a warrant, at approximately 11:30 a.m., and the defendant pointed out the gun, which was protruding from under a couch with the butt readily observable. Without disturbing the scene, the officers left the residence, and Wiggin and his associate returned the defendant to the police station. Beaudoin remained outside the house with the crime team to await notification that a search warrant had been obtained.

At about 12:30 p.m., Lieutenant Buxton obtained a search warrant for the defendant's residence and vehicle, and radioed ahead for the crime lab team to begin the search of the house. When the crime lab team entered the house, Beaudoin showed them the location of the gun, which they then seized along with other incriminating evidence.

At approximately 1:30 p.m., two and one-half hours after his arrest, Holler was taken to the Exeter Hospital, where his blood-alcohol level was measured at .32.

The defendant was indicted for second-degree murder. At a pretrial hearing, he moved to suppress all statements that he had made to the police and all evidence seized pursuant to the warrant. The trial court granted the motion with respect to statements made to the police in response to questioning after the defendant's request for legal counsel, but denied the motion as to the defendant's unsolicited statements. The court further ruled that the search warrant was valid, that the gun and other evidence found at the scene was legally seized pursuant to the warrant, and that such evidence was therefore admissible. At trial, the State introduced the gun, the other physical evidence, and testimony relating to the defendant's unsolicited incriminating statements. Based on this evidence, the jury found the defendant guilty of manslaughter.

After determining the defendant's guilt, the jury was advised that they would hear the sanity phase of the trial. At this point, a juror

requested to be replaced because of "personal feelings" that would affect his judgment. The juror was excused, and one of the alternates was seated in his place. The defense counsel then moved for voir dire on the insanity defense. The trial court denied the request, stating that this might result in a jury of less than the required twelve persons.

Following the completion of the sanity phase of the trial, the jury returned a verdict of sane. The defendant was sentenced to twelve to twenty-five years in the State prison and now appeals.

■ The defendant first contends that the gun was the fruit of an illegal interrogation and search, and that the trial court therefore erred in admitting the weapon into evidence. We need not dwell upon the underlying arguments regarding the illegality of the interrogation and search. The trial court found that the conversation between Corporal Wiggin and the defendant, which led to the search and initial discovery of the gun, violated the defendant's sixth amendment right to counsel, because it constituted interrogation initiated by the police after the defendant had asserted that right. *See State v. Beaupre*, 123 N.H. 155, 158, 459 A.2d 233, 235–36 (1983); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Cognizant of the conflicting testimony as to who initiated the conversation, and reluctant to substitute our judgment for that of the trial court, *see State v. McGann*, 122 N.H. 542, 542, 447 A.2d 128, 128 (1982), we hold that sufficient evidence existed to support the trial court's finding that the conversation was improper.

■ Because we uphold the trial court's finding that the conversation was illegal, it follows *a fortiori* that the warrantless search resulting from the improper interrogation was also illegal. Thus, the critical question before us is whether the trial court correctly admitted the gun into evidence despite the illegal interrogation and search leading to the initial discovery of the weapon. In addressing this issue, we reiterate that Captain Beaudoin observed the gun during the initial illegal search, and was the individual who ultimately directed the other police to the location of the gun during the subsequent search pursuant to the warrant.

■■ The general rule is that evidence must be excluded if it is discovered as a result of police misconduct. *See United States v. Crews*, 445 U.S. 463, 470 (1980). The United States Supreme Court, however, has recognized that evidence initially discovered as a result of unlawful conduct does not automatically and forever become inaccessible. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). If a source independent from the police

misconduct leads to the discovery of the same evidence, then such evidence may be admissible. *Id.* In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court reaffirmed the "independent source" rule of *Silverthorne* and stated:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"

*Id.* at 487–88 (citation omitted).

■■ In addition to the establishment of the "independent source" rule by the Supreme Court, several jurisdictions, including numerous federal appellate courts, have adopted the "inevitable discovery" doctrine as a further exception to the exclusionary rule. *See Com. v. Benoit*, 415 N.E.2d 818, 823 (Mass. 1981) (listing federal courts of appeal that have expressly or implicitly accepted "inevitable discovery" rule). Under this doctrine, illegally seized evidence is admissible if a search was justified, and the evidence discovered illegally would inevitably have come to light in a subsequent legal search. *See, e.g., United States v. Bienvenue*, 632 F.2d 910, 913–14 (1st Cir. 1980); *United States v. Schmidt*, 573 F.2d 1057, 1065–66 n.9 (9th Cir.), *cert. denied*, 439 U.S. 881 (1978); *U.S. ex rel. Owens v. Twomey*, 508 F.2d 858, 866 (7th Cir. 1974); *People v. Fitzpatrick*, 32 N.Y.2d 499, 506–08, 300 N.E.2d 139, 141–42, 346 N.Y.S.2d 793, 797–98, *cert. denied*, 414 U.S. 1050 (1973). An important consideration in applying this doctrine is whether the police have benefited from the initial illegality. *See generally United States v. Crews*, 445 U.S. at 475.

In *State v. Beede*, 119 N.H. 620, 629–30, 406 A.2d 125, 132 (1979), *cert. denied*, 445 U.S. 967 (1980), we applied the inevitable discovery doctrine while upholding the trial court's refusal to suppress a dead body discovered as a result of an illegal search. We recognized that, due to the odor of decay, it was inevitable that a private person would have discovered the body and reported it to the police, thereby providing them with the same information which they had obtained illegally. 119 N.H. at 629–30, 406 A.2d at 132. Although our reliance on the inevitable discovery rule in *Beede* was limited in scope, we believe that the doctrine is applicable in the instant case in conjunction with the "independent source" rule.

The record shows that Lieutenant Buxton left the police station prior to the illegal interrogation and warrantless search, in order to obtain a search warrant for the defendant's house. The affidavit accompanying the warrant application contained specific facts obtained prior to the commission of any illegality. Thus, it is clear that the issuance of the warrant, which the defendant does not now contest, was based on an independent source untainted by the illegal interrogation and search.

As previously mentioned, the weapon was discovered on the floor of the defendant's home with the butt protruding from under a couch. The trial court found that the gun would inevitably have been discovered during a routine search pursuant to the warrant, and that the illegal search in which Captain Beaudoin participated neither significantly contributed to the discovery, nor resulted in any benefit to the police that would not have been obtained in the subsequent legal search. The evidence at trial, including a photograph of the gun protruding in clear view, supported the trial court's finding. We hold that the gun was sufficiently purged of any "taint" resulting from the illegal warrantless search, because the search warrant obtained by Lieutenant Buxton was based on an independent source and because the gun would inevitably have been discovered in the subsequent legal search. As a consequence, we conclude that the trial court properly admitted the gun into evidence.

In applying the inevitable discovery rule, we admonish the police, as we did in *Beede*, not to rely on the rule to justify illegal searches. The element of good faith on the part of the police is inherent in the inevitable discovery exception. We will not permit the police to use this exception as a calculated means of evading the search warrant requirement. *See United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.), *cert. denied*, 419 U.S. 1050 (1974). Rather, we will consider the exception only where the police were acting in good faith. We note that the good-faith standard was satisfied in this case because, although the search warrant was issued after the illegal warrantless search, the police had sought the warrant *prior to and without any reference to the illegality*, and they followed all required procedures for obtaining the warrant.

We now turn to the defendant's second argument; namely, that the trial court committed reversible error when it failed to voir dire the jury, after completion of the guilt phase of the trial, for possible prejudice against the insanity defense. We recently addressed this issue in *State v. Smith*, 123 N.H. 46, 455 A.2d 1041

(1983), wherein we noted that a separate voir dire between the guilt and sanity phases might result in the loss of the required twelve-person jury. We stated, however, that a separate voir dire would not present a problem if the defendant "were to knowingly waive the requirement of twelve jurors . . . and expressly agree that his case may be decided by whatever number of jurors remain unexcused. . . ." *Id.* at 51, 455 A.2d at 1044 (citations omitted). Although the defendant in this case acknowledged the possibility that the requested voir dire might have resulted in a jury of less than twelve, the record reveals that he did not expressly agree to waive the requirement. The trial court's refusal to grant the voir dire, therefore, was within its sound discretion. *See id.*, 455 A.2d at 1045; *State v. Danskin*, 122 N.H. 817, 819, 451 A.2d 396, 398 (1982).

The defendant next challenges the trial court's failure to give certain instructions after completion of the sanity phase of the trial. At the close of the evidence in the sanity phase, the trial judge instructed the jury as to the possible verdicts and their meanings. In accordance with RSA 628:2, I, he told the jury that it was to return a verdict of "not guilty by reason of insanity" if it believed the defendant was insane. Defense counsel excepted to this terminology, claiming that a finding of insanity would require the jury to return a verdict of "guilty but found to be insane." As a consequence, the trial judge immediately reinstructed the jury that the language "not guilty by reason of insanity" was largely superfluous and that the meaning of the term was for all practical purposes equivalent to "guilty but insane."

After deliberating for some time, the jury returned and asked the court two questions: (1) "If we say he is sane is he still guilty of manslaughter?" and (2) "If we say he is insane is he still guilty of manslaughter?" The court informed defense counsel in chambers that he proposed to answer the questions: "(1) Yes; (2) No, he is not guilty by reason of insanity." Defense counsel, however, excepted to the proposed answer to the second question and requested that the jury be specifically reinstructed that a finding of insanity would result in a verdict of "guilty but insane." The trial court noted that the defendant's request was inconsistent with RSA 628:2, denied the request, and supplied the jury with the answers mentioned above.

We hold that the trial judge correctly found that the "guilty but insane" language requested by the defendant was inconsistent with RSA 628:2, I, which states that "[a] person who is insane at the time he acts is not criminally responsible for his conduct." In addition, a review of the entire charge to the jury indicates that the trial court's instructions were thorough and fair, and complied with our

direction in *Novosel v. Helgemoe,* 118 N.H. 115, 125, 384 A.2d 124, 130 (1978), regarding the required subject matter of such instructions. Thus, we conclude that the trial court's instructions and responses to the jury's questions were proper, and that the trial judge acted within his sound discretion in refusing to repeat the erroneous charge requested by the defendant.

 Finally, the defendant challenges the New Hampshire jury selection process as inherently discriminatory. We have addressed this issue on a number of occasions and find no reason to overturn our previous decisions. *See State v. Elbert,* 121 N.H. 43, 45–47, 424 A.2d 1147, 1148–50 (1981); *see also State v. Smith,* 123 N.H. at ---, 455 A.2d at 1045; *State v. LaRoche,* 122 N.H. 231, 234, 442 A.2d 602, 604 (1982).

*Affirmed.*

All concurred.