Merrimack
No. 7331

STATE OF NEW HAMPSHIRE

v.

JOHN DOE

December 3, 1975

*Warren B. Rudman,* attorney general, and *Robert V. Johnson II,* assistant attorney general, and *Edward N. Damon,* attorney *(Mr. Johnson* orally), for the State.

*Arthur E. Robbins,* of Massachusetts, and *Vincent J. Nardi II (Mr. Robbins* orally) for Mr. Doe.

GRIMES, J.   The issue in this case is whether the contents of the affidavit and the evidence presented orally under oath were sufficient to support the issuance of a search warrant to take blood samples, saliva samples, and hair samples from the head and pubic area of John Doe. A warrant was issued by *Keller,* C.J., who transferred Doe's objections prior to execution of the warrant.

On May 20, 1975, a twenty-two-year-old white woman was found dead on a bed in her apartment in Concord. The affidavit and evidence under oath submitted in support of the warrant contain among other facts and circumstances the following: An autopsy was performed and it was determined that death was due to strangulation. John Doe, a black man, admitted to the police that on May 20, 1975, he was living in an adjoining apartment in the same building as the victim and that he knew her and knew that she was living alone. A friend of the victim living in the same building told the affiant that the victim had told her that around May 10, 1975, at about 2 a.m., Doe had come to her apartment and asked her to go to a party with him, and that she declined. Affiant has no reason to believe that this person has any reason to distort what was told to her. A sister of the victim told a police officer that the victim had told her that Doe told her he wanted to see her in the nude and she was "afraid of a colored guy living next door to her." Fellow employees of the victim told the police that the victim gave them the impression she was afraid of a black man married to a white woman living near her and who was always hanging around her doors and windows. A person who stated he was a friend of Doe's told the police that a few days before the victim was found dead, he and Doe were watching the victim come out of her apartment and that Doe remarked "some day I'm going to get me a piece of that white meat." Doe admitted that he had been drinking on the night of May 19-20 and told the police that he left work at about 12:45 a.m. and was driven to his apartment where he arrived at about 12:50. He said that he woke his wife to tell her he heard the victim and her husband fighting. Doe's wife stated that this occurred at 1:05 a.m., after previously having stated that it had been at 1:30 a.m. She also stated she had not heard any sounds of fighting.

Stains on the pillow on which the victim's head rested, on testing, were found to be type A blood. Seminal stains on a towel revealed that the subject was a secreter and had type AB or B blood. The affiant on May 21, 1975, found fingerprints on the outside window in front of the victim's apartment which were partly smudged and in a position which indicated the person had slid the window open. These were found to match the fingerprints of Doe who could not successfully explain how his prints got on the window. Several hairs were found on the sheets of the bed where the victim was found, and one on her abdomen and one on her left hand. Laboratory tests showed all these hairs to be of Negroid origin. All other black men living in the apartment house consented to give samples of

their blood, hair and saliva. The victim's husband took a polygraph test given by a reliable and qualified operator who determined that he was being truthful when he denied causing the death of his wife. The position of the clothing around the victim's neck and the presence of fresh scratch and abrasion marks on her neck formed the basis of the affiant's opinion that the killer did not have short fingernails. The victim's husband's fingernails on May 20 were short, while Doe's, which were examined several days later, were slightly longer than normal.

Before issuing the warrant, the trial justice heard sworn testimony of the affiant with regard to the credibility of the persons named in the affidavit who had given information, and of the captain in charge of the State Police Criminal Laboratory, who testified as to the competency and reliability of the persons who performed the various tests and as to the importance of obtaining samples from Doe to either rule him out as a suspect or establish a relationship or consistency with the items and materials found at the scene.

At a later hearing before the issuance of the warrant, the justice heard evidence from the same captain and from a doctor at the New Hampshire Hospital as to the manner in which the samples would be taken and the amount thereof. This testimony revealed that there would be no pain involved in taking the hair or saliva samples and the blood sample would be less than that required for a blood alcohol test. The evidence given under oath before the warrant was issued may, of course, be considered along with that contained in the affidavit. *State v. Titus*, 107 N.H. 215, 220 A.2d 154 (1966); *State v. Salsman*, 112 N.H. 138, 290 A.2d 618 (1972); *State v. Moreau*, 113 N.H. 303, 306 A.2d 764 (1973).

The warrant provides that the samples shall be taken at the New Hampshire Hospital and prescribes the quantities to be taken, that the blood shall be taken under the supervision of a named doctor, and that the hair and saliva samples shall be taken by the captain of the crime laboratory. It further provides that Doe shall be detained only during the time necessary to transport him to and from the hospital and not over two hours at the hospital.

We begin by disposing of any claim that the evidence with respect to the informers was insufficient to establish the reliability of their information or their credibility. The identity of each person giving information was disclosed by name in the affidavit, their relationship to the victim and Doe was set forth, the employment of some was given, and the absence of any circumstances which would

suggest the presence of any motivation to falsify was asserted. The affiant and the captain both testified that they believed the persons to be credible and that they could find no reason to doubt them. We hold that this is sufficient. *See United States v. Harris,* 403 U.S. 573, 600 (1971) (Harlan, J., dissenting); *Jaben v. United States,* 381 U.S. 214 (1965); *United States v. Ventresca,* 380 U.S. 102 (1965); *State v. Collins,* 112 N.H. 449, 298 A.2d 742 (1972).

Doe does not and cannot seriously claim that the State cannot take the samples in question if fourth amendment requirements are met. This was decided in *Schmerber v. California,* 384 U.S. 757 (1966). No fifth amendment rights are involved. *Id.; State v. Arsenault,* 115 N.H. 109, 336 A.2d 244 (1975). Also there is no question but that the samples will be taken in a reasonable manner in the hospital and the court has provided that his attorney may be present if he wishes. The sole question remaining, therefore, is whether the facts and circumstances presented to the court were sufficient to support its finding that probable cause to search existed. We hold that they were.

Contrary to Doe's contention in oral argument, probable cause to search is not the same as probable cause to arrest. Probable cause to arrest exists where the facts and circumstances within the officer's knowledge or of which he has reasonably trustworthy information would warrant a man of ordinary caution in the belief that the arrestee has committed or is committing a crime. *Ker v. California,* 374 U.S. 23, 37 (1963). But the right to search is not dependent upon the right to arrest. *Carroll v. United States,* 267 U.S. 132, 158 (1925). Probable cause to search exists if the man of ordinary caution would be justified in believing that what is sought will be found in the place to be searched *(Id.* at 162) and that what is sought, if not contraband or fruits or implements of a crime, will "aid in a particular apprehension or conviction." *Warden v. Hayden,* 387 U.S. 294, 307 (1967); *see Search and Seizure in the Supreme Court: Shadows on the Fourth Amendment,* 28 U. Chi. L. Rev. 664, 687 (1961). We do not hold that probable cause to arrest is lacking, but only that it is not essential to the issuance of a search warrant.

"[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli v. United States,* 393 U.S. 410, 419 (1969); *United States v. Ventresca,* 380 U.S. 102, 107-09 (1965); *State v. Comeau,* 114 N.H. 431, 321 A.2d 590 (1974). The evidence presented to the trial justice in this case meets this test.

The evidence before the court established that Doe is a black

man and that hairs found on the body of the white victim and on the bed where it was found were of Negroid origin. Doe was in the vicinity of her apartment on the night of her murder. He, therefore, had the opportunity to commit the crime. His statements that he wished to see her nude and to have sexual relations with her also furnished a motive. The victim's husband has been eliminated as a suspect. Doe's fingerprints were on the window of her apartment and there was evidence that he had been attempting to date her, that she was afraid of him, and that he loitered around her doors and windows. Scratch and abrasion marks on the face and neck of the victim, made through wearing apparel, indicate the culprit did not have short fingernails. Doe's nails were longer than normal. All other black men living in the apartment house consented to give samples of their hair, blood and saliva.

We are of the opinion that this was sufficient to justify the search for evidence and the limited detention necessary to conduct it. *See Davis v. Mississippi*, 394 U.S. 721, 728 (1969); *United States v. Dionisio*, 410 U.S. 1 (1973); *Schmerber v. California*, 384 U.S. 757 (1966). We are also satisfied that there is a sufficient nexus between the evidence sought and the crime under investigation. *Warden v. Hayden*, 387 U.S. at 307.

*Exceptions overruled.*

KENISON, C.J., concurred in the result; the others concurred.

Request of Governor and Council
No. 7403

OPINION OF THE JUSTICES

December 19, 1975

The following resolution was adopted by the Governor and Council on December 15, 1975, and filed with the supreme court on December 15, 1975:

"WHEREAS,

(I) Part 2, Article 50 of the New Hampshire Constitution authorizes the Governor, with the advice of the Council, to call the General Court together 'sooner than the time to which it may be adjourned, or prorogued, if the welfare of the state should require the same.';

(II) Part 2, Article 19 of the New Hampshire Constitution which had read '[T]he house of representatives shall have power to adjourn themselves, but no longer than five days at a time.' was amended in 1966 to read '[T]he house of representatives shall have the power to adjourn themselves.';

(III) Part 2, Article 36 of the New Hampshire Constitution which had read '[T]he senate shall have power to adjourn themselves, provided such adjournment do not exceed five days at a time. *Provided nonetheless,* that whenever they shall sit on the trial of any impeachment, they may adjourn to such time and place as they may think proper al-

though the legislature be not assembled on such day, or at such time.' was amended in 1966 to read '[T]he senate shall have power to adjourn themselves, and whenever they shall sit on the trial of any impeachment, they may adjourn to such time and place as they may think proper although the legislature be not assembled on such day, or. at such place.';

(IV) In December of 1971, both houses of the General Court stood in adjournment subject to the joint call of their presiding officers, and Governor Peterson and the Council believed it necessary to call the Legislature together for the welfare of the State. In light of the 1966 amendments to Part 2, Articles 19 and 36 of the New Hampshire Constitution, the Governor requested the Attorney General to render an opinion as to whether the Governor and Council could call the legislature together;

(V) The Attorney General ruled on December 8, 1971, that the Governor and Council did have the power to call the General Court together when required by the welfare of the State, when each house had adjourned itself, but he noted that unless there would be an adjournment or prorogation of the General Court, with its agreement, by the Governor, with advice and consent of the Council, any such meeting of the General Court would be a continuation of the regular session so that the members would not be entitled to per diem and mileage payments under Part 2, Article 15.

(VI) In accordance with that opinion of the Attorney General, on January 6, 1972 each of the houses assembled and passed a concurrent resolution designating a committee to wait upon the Governor to 'inform him that the Legislature ... [had] completed the business of the session and ... [was] ready to be adjourned until the last Wednesday of December and to receive any

communication which he ... [might] wish to make.', following which the Governor appeared and prorogued the General Court, following which a special session was called by the Governor and Council on February 1, 1972 which commenced on February 8, 1972;

(VII) The House of Representatives, on July 7, 1975, adjourned 'to the call of the speaker.' (1975 Journal of the House 1921);

(VIII) The Senate, on June 26, 1975, adjourned 'to the call of the Chair.' (1975 Journal of the Senate 1046);

(IX) Thus, both houses adjourned without the adjournment or prorogation by the Governor with the advice of the Council authorized by Part 2, Article 50 of the New Hampshire Constitution;

(X) The Governor and Council believe that the welfare of the State requires that the General Court be called together in order to consider a crisis in group medical and hospital insurance;

(XI) The Speaker of the House of Representatives has publicly questioned, in a press release dated December 15, 1975, whether 'the Governor [can] recall the Legislature if it is adjourned to the call of its presiding officers.'

(XII) The Speaker has also questioned whether any assembly of the Legislature at the call of the Governor and Council under Part 2, Article 50 would, on the existing facts, be a continuation of the regular session or a special session, and it is his position that such assembly of the General Court would be a special session for purposes of mileage and per diem payments under Part 2, Article 15, contrary to the opinion of the Attorney General dated December 8, 1971;

(XIII) The Governor and Council understand that the President of the Senate similarly believes that

there are two genuine questions, as raised by the Speaker.

(XIV) Since the welfare of the State and its citizens demand the prompt attention of the General Court, and since apparent disagreement over the power of the Governor and Council under the present circumstances and disagreement over legislative mileage and per diem payments will undoubtedly be raised at some point in the near future and will until settled compete for the attention of all parties involved with those serious concerns which prompt the Governor and Council to plan to call the General Court into session under Part 2, Article 50. This situation constitutes a solemn occasion in which important questions of law are presented, on which questions the guidance of the Justices of the Supreme Court would be most valuable;

"NOW, THEREFORE, BE IT RESOLVED that the Justices of the Supreme Court be respectfully requested to give their opinion on the following important questions of law:

(1) Did the 1966 amendments to Part 2, Articles 19 and 36 of the New Hampshire Constitution, which by their own terms and as presented to the voters merely deleted the five day limitation on self-adjournment by the Legislature, by implication remove from the Governor and Council the power granted in Part 2, Article 50 of the New Hampshire Constitution to call the Legislature together when the General Court stands in adjournment if the welfare of the State so requires?

(2) If the answer to question 1 is no, if the Governor, with the advice of the Council, issues a call to the General Court to return to session under these circumstances, without the further act of adjournment or prorogation by the Governor with the advice of the Council, will the resulting session be a continuation of the regular session, as the Attorney General has advised, or will it be a

'special session' within the meaning of Part 2, Article 15 of the New Hampshire Constitution?

"AND BE IT FURTHER RESOLVED that the Secretary of State be directed to transmit six attested copies of this resolution to the Clerk of the Supreme Court."

The following answer was returned:

*To His Excellency the Governor and the Honorable Council:*

The undersigned justices of the supreme court give the following answers to the questions contained in your resolution adopted on December 15, 1975, and filed with us on the same day.

Your first question asks whether the 1966 amendment to part II, arts. 19 and 36 of the State constitution, which removed the five-day limitation on the power of the legislature to adjourn itself, by implication removed from the Governor and Council the power to call the general court together when it stands in adjournment if the welfare of the State so requires. Our answer to this question is "No."

Part II, article 50 reads as follows: "The governor, with advice of council, shall have full power and authority, in the recess of the general court, to prorogue the same from time to time, not exceeding ninety days, in any one recess of said court; and during the sessions of said court, to adjourn or prorogue it to any time the two houses may desire, and to call it together sooner than the time to which it may be adjourned, or prorogued, if the welfare of the State should require the same."

Giving the house and senate the power to adjourn themselves is not inconsistent with the power of the Governor and Council under part II, article 50 to call the general court together "if the welfare of the state should require the same". Nothing in the texts or descriptions presented to the voters in 1966 suggested in any way that the adoption of the amendments to part II, articles 19 and 36 would "by implication remove from the Governor and Council the power granted in Part 2, Article 50." The amendments to articles 19 and 36 have no such effect. *Gerber v. King,* 107 N.H. 495, 225 A.2d 620 (1967). "In this state the climate for repeal by implication is frosty and inhospitable." *Opinion of the*

*Justices,* 107 N.H. 325, 328, 221 A.2d 255, 257 (1966).

The house and senate are styled "The General Court of New Hampshire." N.H. CONST. pt. II, art. 3. When the house and senate are adjourned subject to the call of their presiding officers, the general court is adjourned since the term "general court" is simply the style given the house and senate. The power given to the Governor with advice of Council in article 50 "to call it together" exists when the house and senate are not assembled for whatever reason. Each house being in adjournment at the call of its presiding officers, they are not assembled, and the Governor with advice of Council may call the general court together "if the welfare of the state should require it."

Your second question asks: If the Governor with the advice of Council should call the general court together under part II, article 50 without the further act of adjournment or prorogation by the Governor with the advice of Council, will the resulting session be a special session or a continuation of the regular session within the meaning of part II, article 15? Our answer is that such a session would be a special session within the meaning of part II, article 15.

The effect of the 1966 amendments was to give each house the right to adjourn itself without limitation, thereby furnishing a method of adjournment of the general court independent of and in addition to the method supplied by part II, article 50. *See In re Opinion of the Justices,* 303 Mass. 664, 22 N.E.2d 261 (1939). Both the house of representatives and the senate have adjourned themselves under authority of part II, articles 19 and 36, respectively, subject to the call of their presiding officers. No such call has been issued.

If the Governor with advice of Council should call the general court "together sooner than the time to which it may be adjourned" (pt. II, art. 50), in this case at the call of their presiding officers, such a session would be a "special session" within the meaning of part II, article 15 which expressly recognizes this as one of two methods of calling a special session.

FRANK R. KENISON
LAURENCE I. DUNCAN
EDWARD J. LAMPRON
WILLIAM A. GRIMES
ROBERT F. GRIFFITH

Governor Meldrim Thomson, Jr., and the Executive Councilors Lyle E. Hersom, James H. Hayes, Leon G. Yeaton, Louis D'Allesandro and Bernard A. Streeter, Jr., by Warren B. Rudman, attorney general, David H. Souter, deputy attorney general, and Assistant Attorneys General Thomas D. Rath, Richard V. Wiebusch and Attorney James E. Morris, filed memorandum of law.

Alf E. Jacobson, president of the senate, filed memorandum of law.

George B. Roberts, Jr., speaker of the house of representatives, by Michael R. LaFontaine, Esq., filed memorandum of law.

Marshall French, majority leader, Ruth L. Griffin, majority whip, Philip R. Currier, assistant majority leader, Elaine T. Lyons, assistant majority leader, Richard P. Brouillard, assistant majority whip, Elizabeth A. Greene, assistant majority whip, Russell C. Chase, chairman, majority caucus committee, filed memorandum of law.

Henry C. Newell filed memorandum of law.

Dan O'Connell filed memorandum of law.

694

Henry C. Newell filed memorandum of law.

Dan O'Connell filed memorandum of law.