Hillsborough
No. 87-019

# THE STATE OF NEW HAMPSHIRE

## v.

# KAREL J. HOUTENBRINK

April 1, 1988

*Stephen E. Merrill*, attorney general (*John S. Davis*, assistant attorney general, on the brief, and *David S. Plourde*, assistant attorney general, orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant was convicted after a jury trial in the Superior Court (*Wyman*, J.) under indictments of both first degree assault, RSA 631:1, and felonious use of a firearm, RSA 650-A:1, and was sentenced to five to fifteen years at the State prison for the assault and to one year for the felonious use of the firearm, to run consecutively. On appeal, the defendant argues: (1) that the imposition of consecutive sentences for first degree assault and the felonious use of a firearm violates part I, article 16 of the New Hampshire Constitution, which guarantees protection against double jeopardy; (2) that the warrantless entry into his apartment by officers of the Manchester Police Department was not based

upon probable cause and therefore violated the guarantee of protection against unreasonable searches and seizures contained in the fourth amendment to the United States Constitution and in part I, article 19 of the New Hampshire Constitution; and (3) that the search warrant which the police obtained subsequent to his arrest in order to search for his handgun was invalid under both State and Federal Constitutions because it relied, for probable cause, upon the statement of his girl friend, which was elicited by the police after the girl friend was arrested during the unlawful entry. We affirm the assault conviction, but reverse the felonious use conviction.

Early in the morning hours of May 20, 1986, the defendant, accompanied by his girl friend, Bonnie Decker and roommate Keith Descoteaux, took his pit bull terrier for a walk in downtown Manchester. At the defendant's request, Decker carried the defendant's 9 mm Taurus semi-automatic pistol in her purse.

Shortly after 2:00 a.m., the defendant, Decker and Descoteaux encountered two women with whom they were not acquainted, Charlene Chase and Bonnie Delisle, who were walking near the intersection of Bridge and Union Streets. Descoteaux began shouting insults at Chase and Delisle, who responded in kind while they continued walking up Union Street toward Pearl Street.

Soon thereafter, one of the men threw a beer bottle at Chase and Delisle and it smashed on the ground several feet behind them. Hearing the beer bottle shatter behind her, Delisle turned around and saw a dark-haired man with a moustache, wearing a red T-shirt with white lettering on it, a second, taller man, and a woman with shoulder-length dark hair. The three people were accompanied by a dog, which appeared to Delisle to be vicious. Delisle told Chase that they should leave the area because of the presence of the dog.

Seconds later, the two women heard explosions which they thought were generated by firecrackers, but which, in reality, were shots from the defendant's pistol, which he had taken from Decker and had begun firing rapidly, emptying the ammunition clip. After hearing the first shots, Delisle turned around and saw the defendant holding an object in his hand; his hand was in the air and sparks were emanating from the object he held. Chase soon realized that she had been shot and that her legs were bleeding, whereupon she began to run to the nearest house, where Delisle awakened the occupants in order that they would call an ambulance. Within seconds, the defendant and his two companions ran across Bridge Street, down an alley and into the back door of their apartment building, 76 Walnut Street.

At 2:23 a.m., a Walnut Street resident, Rick Jones, heard the gunshots and telephoned the police. Meanwhile, Officer Greg Murphy, who was on duty in his patrol car and had also heard the shots, was dispatched to Union and Pearl Streets. Officer Murphy administered first aid to Charlene Chase, then interviewed Bonnie Delisle, who described the assailant as a white male approximately 5 feet 7 inches tall, with short, dark, curly hair and a bushy moustache, who was wearing a red T-shirt and walking a small, black dog. Delisle described the assailant's companions as a tall, white male and a white female with shoulder-length brown hair, wearing a long dress.

Officer Murphy then was dispatched to Bridge Street, where he spoke to neighborhood residents Steven Lessard and Gary White. Both of them had heard gunfire and had looked out the windows of their respective upstairs apartments and had seen two men, one wearing a red T-shirt, and a woman wearing a flowered dress run across Bridge Street and into the alley between Union and Walnut Streets.

In the meantime, Officer Richard D'Auria had arrived, accompanied by a German shepherd police dog, and at approximately 2:30 a.m. had begun using the dog to track the defendant's scent. The dog tracked the scent to the northernmost rear stairway, behind the defendant's apartment, at 76 Walnut Street. At approximately the same time, Officer D'Auria was informed by radio that the suspects might be hiding in the first floor rear apartment at 76 Walnut Street. Dispatcher Paula Glennon had spoken with an anonymous caller who had heard the shooting, the cries of Chase and Delisle, and footsteps approaching 76 Walnut Street from the rear. The caller, who also lived at that address, and who was later identified as Rick Jones, indicated that he had heard one of the people who had recently entered the building say that his ears were still ringing from the gunshots. The caller also told dispatcher Glennon that earlier he had seen one of his neighbors, who lived in the first floor right rear apartment and whose name was Keith, handling a gun on the porch of the building. Glennon relayed to the officers at the scene the name and apartment number which the caller had given her.

Officer D'Auria reported the results of tracking the defendant's scent to Sergeant Robert Duffey, who then checked the mailbox of the first floor right rear apartment, 1 C, and discovered that it bore the name Keith Descoteaux. After locating the name "Keith" on the mailbox, Sergeant Duffey ordered a forced entry of the apartment; at 2:40 a.m., police officers kicked open the front door of the

defendant's apartment, entered, and arrested the defendant, Decker and Descoteaux.

At the police station later that morning, Bonnie Decker, in an interview with Detective Richard Tracy, described the shooting and the events which preceded and followed it. She stated that before the police had arrived, she had placed the defendant's pistol behind her bed located within the defendant's apartment. Based upon this information, Detective Tracy applied for and obtained a warrant to search the defendant's apartment for a 9 mm handgun and ammunition. At approximately 8:30 a.m., Detective Tracy executed the warrant and found the gun behind the bed and a box of ammunition nearby. The gun matched the copper bullet fragment and the fourteen discharged cartridge casings found at the scene of the shooting. At trial, the handgun and ammunition were admitted into evidence over objection, and the jury found the defendant guilty of first degree assault and the felonious use of a firearm.

The defendant contends, first, that his consecutive sentences for first degree assault and felonious use of a firearm violate the guarantee against double jeopardy contained in part I, article 16 of the New Hampshire Constitution. He maintains that, but for his use of a handgun, he would have been charged with simple assault, a misdemeanor; hence, to upgrade the charge to first degree assault as a result of the use of a gun and then to impose an additional penalty for the felonious use of a firearm is to punish him twice for the same offense. We agree.

Part I, article 16 of the New Hampshire Constitution provides that "[n]o subject shall be liable to be tried, after an acquittal, for the same crime or offense." On its face, the article prevents a defendant from being tried a second time if he has been acquitted for the same crime in a previous trial. Despite this relatively simple facial expression of a defendant's rights, the double jeopardy analysis of cases under article 16 has developed carefully.

In *State v. Smith*, 98 N.H. 149, 95 A.2d 789 (1953), we permitted a second trial for assault where the defendant had been previously charged and acquitted of gross, lewd and lascivious behavior. We held that double jeopardy protection is afforded a defendant only where the previous offense charged was the "same *in law* and *in fact*." (Emphasis in original.) *Id.* at 149, 95 A.2d at 790. We held that the second prosecution was permissible because the first required proof of unconcealed lewdness, while the second required proof of physical violence, however slight, or the threat thereof. *Id.* at 150, 95 A.2d at 791.

In *State v. Gosselin*, 117 N.H. 115, 370 A.2d 264 (1977), we held that a defendant who possessed a loaded revolver could be tried and convicted for the misdemeanor offense of carrying a gun without a license and also tried and convicted for being a felon in possession of a revolver. *Id.* at 118–19, 370 A.2d at 267–68. Since the first conviction required proof that the defendant possessed a loaded gun that was concealed, which the second did not, and the second required proof that the defendant was a felon, which the first did not, we found no double jeopardy violation under article 16. *Id.* We also stated that our constitution

> "does not prevent the threat of twice being punished for the same act, but rather, forbids twice being tried and convicted for the same offense. This doctrine is effectuated by means of the 'same evidence' test of the identity of offenses. If a difference in evidence is required to sustain the offenses charged, the fact that they relate to and grow out of one transaction does not make them a single offense when two or more are defined by statutes."

*Id.* at 118, 370 A.2d at 267 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (citations omitted). Hence, in *Gosselin* we specifically rejected the "same transaction" test of double jeopardy urged by the defendant. 117 N.H. at 119, 370 A.2d at 268.

We further examined a double jeopardy claim under our State Constitution in *Heald v. Perrin*, 123 N.H. 468, 464 A.2d 275 (1983). In that case the defendant Heald claimed that the original crime, as charged, Class A robbery, had been enhanced because he had used a gun in the course of the robbery, and hence that he could not also be charged with the felonious use of a firearm. *Id.* at 470, 464 A.2d at 276. Had the defendant not used a gun, under the robbery statute, he could only have been charged with a Class B offense. *Id.* at 473, 464 A.2d at 278; RSA 636:1, III(a). The defendant was also charged under RSA 651:2, II-b, which requires that upon conviction for the felonious use of a firearm, the defendant be given, in addition to any punishment for the underlying felony, a minimum mandatory sentence of one year of imprisonment for a first offense.

In *Heald* we stated: "[I]nquiry in each case has centered on what evidence will be required at trial to prove the elements of the crimes." 123 N.H. at 473, 464 A.2d at 278. Hence, "the benchmark of the double jeopardy test in this State [is] an inquiry focusing on whether proof of the elements of the crimes *as charged* will in actuality require a difference in evidence." *Id.* (Emphasis in original.)

We concluded in *Heald* that since there had been multiple enhancements because of the defendant's use of a gun, there was a violation of article 16. Both of the statutory provisions in *Heald* operated on the basis of the same evidence; namely, that the defendant had committed robbery while armed with a gun. Thus, the defendant's use of a gun was relied upon twice, once to elevate robbery from a Class B to a Class A felony and once to impose an additional one-year sentence for felonious use of a firearm.

We further concluded that: "Where a criminal defendant's use of a gun is used to trigger such enhancement provisions, it will generally follow that the felonious use of a firearm cannot *also* be charged for commission of the same felony with the same gun because the elements of neither crime will require a single difference in evidence at trial." *Id.* at 474, 464 A.2d at 278. (Emphasis in original.) We also concluded, however, that "felonies which themselves are not enhanced because of the defendant's use of a gun are also not likely to run afoul of the double jeopardy prohibition." *Id.* at 474, 464 A.2d at 279. This case may be contrasted with *State v. Elbert*, 128 N.H. 210, 512 A.2d 1114 (1986), wherein we determined that article 16 did not prohibit the sentencing of a defendant for both attempted murder and the felonious use of a firearm, when those sentences resulted from simultaneously prosecuted indictments which had only a single enhancement by virtue of the charge of the felonious use of a firearm. *Id.* at 214, 512 A.2d at 1117. In short, the legislature did not include any enhancement provision in the attempted murder charge simply because a gun was involved, and hence the legislature could constitutionally enhance the penalty once, pursuant to RSA 651:2, II-b, because the defendant perpetrated the crime with a firearm.

Finally, in *State v. Moses*, 128 N.H. 617, 517 A.2d 839 (1986), we found that it was a violation of double jeopardy protection to prosecute for a greater offense (use of a vehicle by an habitual offender) after a conviction for a lesser-included one (operating a vehicle after revocation or suspension). We looked to the intention of the legislature in devising the statutory scheme for punishment and concluded, "We believe that the defendant is correct in asserting that the legislature did not intend to authorize the State to prosecute him as an habitual offender after convicting him for operating after revocation, and in asserting that in any event the State and federal double jeopardy clauses barred the habitual offender prosecution." *Id.* at 620, 517 A.2d at 840–41.

■■ Thus, if the underlying criminal statute has an enhancement provision for firearm use, which was charged in *Heald*, then a further enhancement for the felonious use of a firearm will be a double jeopardy violation. However, if the underlying criminal statute does not have an enhancement provision for use of a firearm, then an enhancement for the felonious use of a firearm does not result in a double jeopardy violation. *See State v. Elbert supra*. The legislature may twice punish a defendant for the same act, *State v. Gosselin*, 117 N.H. at 118, 370 A.2d at 267, and the decision to punish a defendant more severely if he uses a firearm in the commission of a felony is a permissible legislative decision.

■ Turning to this case, a close examination of our assault statutes indicates that conduct of a defendant which is performed "knowingly" (as was alleged here) can form the basis either of the highest degree of proscribed assaultive behavior, a Class A felony, or the basis of a misdemeanor, depending on whether a deadly weapon is used.

RSA 631:1, II states that a person is guilty of first degree assault, a Class A felony, if he:

> "[p]urposely or knowingly causes bodily injury to another by means of a deadly weapon."

RSA 631:2-a, I(a) states that a person is guilty of simple assault, a misdemeanor, if he:

> "[p]urposely or knowingly causes bodily injury or unprivileged physical contact to another . . . ."

The statutes thus reveal that a defendant's conduct, performed "knowingly" and causing "bodily injury," can result in a Class A felony or a misdemeanor depending on whether the defendant used a deadly weapon to inflict the harm. Because the underlying crime of knowing assault is itself enhanced by the use of a deadly weapon, the perpetrator cannot be sentenced a second time for felonious use of a firearm under RSA 650-A:1, since such a double enhancement violates the double jeopardy provision of article 16. *Heald v. Perrin*, 123 N.H. 468, 464 A.2d 275. The conviction of the defendant and the sentence imposed pursuant to RSA 650-A:1 are thus unconstitutional and are reversed and vacated.

The defendant next argues that: (1) the warrantless entry into his apartment by police officers was illegal because it was not based upon probable cause and, therefore, (2) the search warrant which the police subsequently obtained based on the statement of his girl

friend, who was arrested during the unlawful entry, was invalid. We disagree with both assertions.

■■ We have stated that the warrantless entry of a private dwelling must be supported by probable cause, *State v. Theodoso-poulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137, *cert. denied*, 446 U.S. 983 (1979), but that "probable cause for a warrantless search is not required to be greater than that for a search pursuant to a warrant," *State v. Maguire*, 129 N.H. 165, 170, 523 A.2d 120, 123 (1987). Probable cause exists "if the man of ordinary caution would be justified in believing that what is sought will be found in the place to be searched . . . ." *State v. Doe*, 115 N.H. 682, 685, 371 A.2d 167, 169 (1975).

■■ We have also stated that "exigent circumstances may justify a warrantless search where there is a compelling need for immediate official action and a risk that the delay inherent in obtaining a warrant will present a substantial threat of imminent danger to life or public safety." *State v. Theodosopoulos, supra* at 580, 409 A.2d at 1139; *see also State v. Slade*, 116 N.H. 436, 438, 362 A.2d 194, 195 (1976). Furthermore, we have observed that

> "[b]y statute and at common law, police officers have a duty to act as 'conservators of the peace' [RSA 105:3]. As such, they have the right, and in some circumstances, the obligation, to act expeditiously to protect the public from an armed person, known to be at large, who has just shot and wounded [another person]. Whether a situation is sufficiently urgent to permit a warrantless search depends on the totality of the circumstances. Even if it can be shown after the fact that no emergency existed, the warrantless entry may be sustained as long as the officers' perception of the emergency was reasonably grounded in the facts known to them at the time."

*State v. Theodosopoulos, supra* at 580, 409 A.2d at 1139. (Citations omitted.)

■ We conclude that the probable cause requirements for a warrantless entry in exigent circumstances were satisfied in this case. First, Officer Murphy had quickly interviewed Lessard and White and learned that the perpetrators had fled across Bridge Street and into an alley between Union and Walnut Streets. Murphy also interviewed the victim's companion, Delisle, who stated that the perpetrator of the assault had headed east on Bridge Street, which is in the general direction of the Walnut Street

apartment. Second, Rick Jones informed the police by telephone that he had heard gunshots, had heard the footsteps of several people approaching the rear entrance to 76 Walnut Street shortly thereafter, and had heard one of the people who entered 76 Walnut Street say that his ears were still ringing from the gunshots. In addition, Jones stated that he had earlier seen Keith Descoteaux handling a gun on the porch of 76 Walnut Street. Jones's information was received by the police within ten minutes of the shooting. It is highly unlikely that Jones could have fabricated such a story, called the police and relayed it to them, all within ten minutes of the shooting. Further, Jones's telephone tip was corroborated by the work of the police dog, which twice tracked the defendant to the stairway which led to the defendant's apartment. We have held that even where such tracking evidence was insufficient, in and of itself, to establish probable cause, it was nevertheless entitled to some weight as an indicator of the path which the perpetrator of a crime had taken from the crime scene. *See State v. Maya*, 126 N.H. 590, 599, 493 A.2d 1139, 1146 (1985). Similarly, in this case, the tracking evidence serves to buttress the report of Jones that persons discussing a gunshot had entered 76 Walnut Street shortly after the shooting. The reliability of Jones's telephone tip was corroborated by the tracking dog, and the dog's tracking was corroborated by the telephone tip, because each occurred within seconds of the other. Third, the discovery by the police of the name "Keith" on the door of the Walnut Street apartment corroborated Jones's statement to the police that he had seen a person he knew to be named Keith playing with a gun on the porch outside the apartment at 76 Walnut Street.

These factors, in combination with the awareness on the part of the police that an actual crime had occurred, *State v. Frazier*, 421 A.2d 546, 550 (R.I. 1980), and the swiftness with which the police were able to obtain the evidence upon which they relied, were sufficient to constitute probable cause for a warrantless entry of the defendant's apartment. "'In dealing with probable cause, as the name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

We also conclude that the exigent circumstances exception to the warrant requirement, *State v. Theodosopoulos*, 119

N.H. at 580, 409 A.2d at 1137, applies in this case, justifying a warrantless entry. The police entered the apartment just seventeen minutes after the shooting.

> "The police activity here was a methodical, continuous and vigorous attempt to apprehend an armed and dangerous person. There is no suggestion that the emergency was artificially created by the State's own action or inaction. Nor are there facts tending to show that the State's failure to obtain a warrant reflected an absence of concern for protecting fourth amendment values. The constitutionality of a given search does not turn on this court's after-the-fact evaluation of whether, as a tactical matter, the police could have deployed their forces differently in response to a confusing emergency situation. We affirm the trial court's ruling that the warrantless entry into the defendant's apartment was both supported by probable cause and justified by a life-endangering emergency created by [the defendant's possession of a handgun and demonstrated willingness to fire it at another person] . . . ."

(Citations omitted.) *Id.* at 581–82, 409 A.2d at 1139–40. "Whether a situation is sufficiently urgent to permit a warrantless search depends on the totality of the circumstances." *Id.* at 580, 409 A.2d at 1139. Since probable cause existed for the warrantless entry by the police into the defendant's apartment, the defendant's rights, under the State and Federal Constitutions, to be free from unreasonable searches and seizures, were not violated.

Finally, since the warrantless entry into the defendant's apartment was not constitutionally proscribed, the search warrant which the police subsequently obtained pursuant to the statement of Bonnie Decker, who was arrested during the warrantless entry, was valid under both State and Federal Constitutions. *See State v. Osborne*, 119 N.H. 427, 431, 402 A.2d 493, 496 (1979) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

We hold that the defendant's conviction and consecutive sentences for first degree assault and felonious use of a firearm violate the prohibition against double jeopardy contained in part I, article 16 of the New Hampshire Constitution. We also hold that the warrantless entry into the defendant's apartment by officers of the Manchester Police Department was based upon probable cause, and hence did not violate State or federal constitutional prohibitions against unreasonable searches and seizures, and that the warrant

which the police later used to search the defendant's apartment for his handgun was therefore valid. We therefore affirm the first degree assault conviction but reverse the felonious use conviction and vacate the sentence for that crime.

*Reversed in part; affirmed in part.*

All concurred.