THE STATE OF NEW HAMPSHIRE

v.

STEVEN A. GALLANT

May 4, 1990

*John P. Arnold*, attorney general (*Clyde R.W. Garrigan*, assistant attorney general, on the brief and orally), for the State.

*Paul G. Schweizer*, of Keene, and *McBride, Wheeler & Widegren*, of Boston, Massachusetts (*Mr. Schweizer, John C. McBride*, and *Robert J. Wheeler, Jr.*, on the brief, and *Francis T. O'Brien, Jr.*, orally), for the defendant.

BATCHELDER, J. Defendant Steven Gallant was charged with possession of cocaine with intent to sell, RSA 318-B:2, I (Supp. 1989), and conspiracy to sell cocaine, RSA 629:3. Prior to trial, he moved to suppress evidence of a large amount of cocaine obtained from the search of the car he was driving immediately before his arrest. The Superior Court (*Morrill*, J.) denied the motion and, after a jury-waived trial, found him guilty of both charges. At a later hearing the court sentenced defendant to an enhanced term in the State Prison, pursuant to RSA 651:6: ten to twenty years for the first charge, and a consecutive five to ten years for the second. Defendant appeals his conviction and sentence to this court on several grounds. He argues that the trial court erred in denying his motion to suppress; and that granting the State's request for an enhanced sentence was error because application of RSA 651:6, I(a), denied him due process and because the State's proof was insufficient. Defendant also contends that the county attorney's actions in seeking an enhanced sentence constituted prosecutorial misconduct. We affirm, finding neither error on the part of the trial court in denying the motion to suppress nor misconduct on the county attorney's part. The record before us reveals that defendant failed to bring to the trial court's attention his claim of error in regard to sentencing under the enhanced sentence statute, RSA 651:6, I(a), specifically denial of due process and insufficient proof; therefore, we need not consider it on appeal. *State v. Stearns*, 130 N.H. 475, 486, 547 A.2d 672, 681 (1988).

In 1986, Trooper Kineen of the New Hampshire State Police arrested a drug dealer named James Willey for possession of cocaine with intent to distribute, and in June 1987, Willey agreed to cooperate with the New Hampshire Drug Task Force, in exchange for a reduced sentence recommendation. Initially, he proved his reliability to the authorities by providing information which led to the arrest and conviction of another dealer. Later, in 1988, Willey, as part of his ongoing cooperation with Kineen, arranged to purchase cocaine from another dealer known by Willey to be engaged in the unlawful marketing of drugs, Anthony Ciufo. Ciufo was also acquainted with the defendant through prior drug deals.

Willey kept Trooper Kineen closely informed of the developing sale and, as the date of the arranged transaction approached, Kineen

formed a strong suspicion that the supplier in the deal was the defendant, Steven Gallant. This suspicion was partially based on information gleaned from a prior drug investigation that took place in 1986, in which Kineen was involved. During that investigation, Kineen listened to an audiotape in which a person named "Steve" discussed selling eighty kilograms of cocaine. Kineen passed the tape on to Detective Sergeant Hayes, from the North Reading (Massachusetts) Police Department, who recognized the voice as that of Steven Gallant of North Reading. Kineen also learned in the course of that investigation that "Steve" had two brothers and that his family owned an electric motor repair business—Gallant Motor Repair—in North Reading. In addition, he discovered that Gallant had a prior criminal record for possession of cocaine.

Kineen strengthened his suspicion about the identity of the supplier with information obtained from Willey as the deal progressed. The sale was to occur on March 19, 1988. At Kineen's request, Willey sought to purchase a wrapped kilo of cocaine in addition to the approximately 750 grams which Ciufo had immediately available. In order for Ciufo's supplier, "Steve," to go to Florida to obtain more cocaine, the sale date was postponed until March 21, 1988. According to the plan, Ciufo would get the drugs from his supplier, "Steve," after "Steve" returned to Massachusetts from Florida, bring them to Willey and Kineen and then take the money back to the supplier. The deal was to take place in a bowling alley parking lot in Newport, New Hampshire.

Willey informed Kineen on March 21 that the supplier, "Steve," was working at his brother's shop and would not be able to come to New Hampshire until he was done with work. At this point, based on the knowledge that the supplier was named "Steve," had Florida drug connections and worked at his brother's electric motor repair shop in North Reading, Kineen was "100 percent sure" that the "Steve" referred to was the defendant, Steven Gallant.

Kineen contacted Detective Sergeant Hayes of the North Reading Police Department and requested surveillance of the defendant at his family's home and business at 206 North Street in North Reading. Hayes had previously, during the 1986 investigation, identified defendant's taped voice. At around five o'clock, during the surveillance, Officer McCormick of the North Reading Police Department saw Gallant and his brother dismantling the door panel of the rear, driver's side door on a white Chrysler New Yorker. McCormick saw the defendant take what McCormick identified, based on his training

and experience, as a wrapped kilo of cocaine from the car and put it into the house at 206 North Street. He saw the defendant then pull up the backseat of the car and transfer something that he believed to be another wrapped kilo of cocaine from the side door panel to a place underneath the backseat of the car. Finally, the defendant took a garment bag from the trunk and brought it into the house.

Shortly thereafter, defendant drove north in the Chrysler. He started out on Route I-93, continued on to Route I-89 and Route 103 west, and ended up in Newport. He was followed by several unmarked police cars from New Hampshire and Massachusetts. Defendant drove over country roads at speeds greatly in excess of the speed limit, pulled into driveways and waited for cars to drive past him, went around municipal blocks in Newport and reversed his direction. The trial court found that "all of [this] was clearly designed to avoid or detect [the] surveillance" of the six to seven unmarked police cars following him.

Believing the defendant had detected the trail of police vehicles and was on the verge of leaving the area, police stopped him on a hill along Maple Street, a residential area of Newport. He was arrested and taken, along with his car, to the Newport police station. According to the State's evidence, the car was removed from Maple Street, rather than searched at the point where it was stopped, for several reasons. Ciufo was still at large and apparently had the capability of removing or destroying the cocaine if the vehicle were left unattended by the roadside. The police also hoped to arrest him. In this regard they were concerned that he might come across the activity on Maple Street, suspect trouble and escape. In addition, the car and numerous police vehicles were blocking traffic in both directions on Maple Street. The police wanted to reopen the street to traffic. Finally, they were concerned that they were at risk in searching the automobile at the bottom of a hill, where visibility was poor.

Once at the police station, approximately ten minutes after defendant's arrest, Trooper Kineen made a warrantless search of the car. He had previously been told by the North Reading police of defendant's earlier activities in the area of the vehicle's backseat and back door panel. In the course of Kineen's search, he lifted up the backseat and found underneath a white plastic bag which was later stipulated to contain 600 to 700 grams of cocaine.

A short time later, roughly ten minutes from the time of Kineen's search, the police took custody of the car and took it to the Newport public works garage, where it was inventoried by Corporal Hunter of

the New Hampshire State Police. It is not apparent from the record why the police did not carry out the inventory procedure at the police station. Corporal Hunter testified, however, that once a car is seized as evidence by the State Police, standard operating procedure is to carry out an inventory of its contents. Apparently based on the observations made during the police surveillance carried out at defendant's home and business at 206 North Street in North Reading, two Massachusetts police officers extended the inventory search by using a screwdriver to remove the rear seat back support. Behind this they found a wrapped kilogram of cocaine. All the contents of the car were seized and listed on a State Police inventory form. At no time did the police obtain a warrant to search the automobile.

After the suppression hearing held on October 6 and 10, 1988, the trial court found that there had existed probable cause to search the automobile, together with exigent circumstances, and a valid inventory search pursuant to standard procedure. The trial court upheld the warrantless search of the car and refused to suppress the evidence found in the course of that search. On October 20, 1988, the court found the defendant guilty after a jury-waived trial, basing the conviction on the State's offer of proof, evidence and testimony received during the suppression hearing, and facts to which the defendant stipulated. The State had notified the defendant on September 29, 1988, of its intention to seek an enhanced penalty pursuant to RSA 651:6. Subsequent to the suppression hearing, the defendant negotiated with the county attorney about sentencing. During negotiations, the county attorney offered to forego seeking an enhanced sentence in exchange for defendant's waiver of his right to appeal. Defendant refused this offer and the county attorney recommended an enhanced sentence of twenty to sixty years. On February 10, 1989, defendant was sentenced to a maximum total of thirty years in the State Prison.

Defendant's first and second arguments on appeal involve trial court error in denying his motion to suppress. First, he alleges that the warrantless stop and search of the car he drove was unconstitutional in that the police lacked probable cause and exigency. Second, he contends that the later inventory search at the public works garage was improper in scope and procedure, the State having failed to provide the trial court with evidence of the usual inventory procedure. He has properly preserved his State and federal claims of unconstitutional search and seizure with regard to these arguments. *See State v. Fowler*, 132 N.H. 540, 545, 567 A.2d 557, 559–60 (1989).

We first consider these claims under the State Constitution, *State v. Berthiaume*, 124 N.H. 264, 266, 470 A.2d 893, 894 (1983), looking to federal law not as binding precedent but only for guidance, *State v. Damiano*, 124 N.H. 742, 746, 474 A.2d 1045, 1047 (1984). We find no violation of State law and do not separately discuss the federal claim, as the fourth amendment of the United States Constitution provides no greater protection in this case than does part I, article 19 of the State Constitution. *See State v. Scarborough*, 124 N.H. 363, 368, 470 A.2d 909, 913 (1983).

■■ Under part I, article 19 of the New Hampshire Constitution, a warrantless search is *per se* unreasonable, absent a recognized exception. *State v. Settle*, 122 N.H. 214, 218, 447 A.2d 1284, 1286 (1982). The State bears the burden of proving by a preponderance of the evidence that a warrantless search was constitutionally permissible. *State v. Theodosopoulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), *cert. denied*, 446 U.S. 983 (1980). An exception to the warrant requirement is recognized where there exists probable cause to search and exigent circumstances, such as the likelihood that a suspect will remove or destroy evidence while a warrant is obtained. *State v. Camargo*, 126 N.H. 766, 770, 498 A.2d 292, 295 (1985). This exception has been defined over time in the decisions of this court discussing the concepts of probable cause, *see, e.g., State v. Houtenbrink*, 130 N.H. 385, 393–94, 539 A.2d 714, 719–20 (1988), and exigency, *see, e.g., id.; State v. MacDonald*, 129 N.H. 13, 20, 523 A.2d 35, 39 (1986). Defendant alleges that the State failed to show both probable cause and exigency.

■ "Probable cause to search exists if the person of ordinary caution would be justified in believing that what is sought will be found in the place to be searched and that what is sought will aid in a particular apprehension or conviction." *State v. Pinder*, 128 N.H. 66, 74, 514 A.2d 1241, 1246 (1986). The trial court's findings in such areas are ordinarily upheld as a matter of course unless clearly erroneous. *See State v. Lewis*, 129 N.H. 787, 791, 533 A.2d 358, 361 (1987).

The trial court found probable cause to search based on the following:

> "The information provided by Mr. Willey, corroborated by police observation of defendant's activities, coupled with independent police observations of Mr. Gallant removing what appeared to be a kilo of cocaine from inside the rear door panel of his car and transferring items from that location to

under the rear seat and topped off with his evasive manner of driving established probable cause to arrest defendant . . . . Based on [this] analysis . . ., I also find . . . probable cause to search defendant's vehicle."

The court's finding is amply supported by the record.

■ As discussed above, informant Willey provided information concerning the drug supplier and the impending transaction. Independent police observations substantiated this information, as did knowledge gained from a prior police investigation. Also, defendant apparently attempted to avoid police surveillance on the road. Against these facts, we cannot say the trial court's finding of probable cause was erroneous.

■ Having found probable cause, we consider whether exigent circumstances existed so as to render it unnecessary for the police to obtain a warrant to search the car. The police plainly were confronted with exigent circumstances when defendant was driving the automobile and they had reason to believe he was heading out of Newport. *Camargo*, 126 N.H. at 770, 498 A.2d at 295. Once the police believed defendant was about to flee and remove the evidence they had probable cause to believe was in the car, exigency existed and they could have searched the car on Maple Street. *Id.* Instead, in the interests of preserving the safety of the police and others lawfully present on the street, unblocking traffic and deterring the escape of defendant's co-conspirator, they chose to move the vehicle to the police station and then shortly thereafter to the public works garage.

Defendant argues, however, that whatever exigency existed on Maple Street evaporated once the automobile was taken into custody. He contends that once the car was taken to the Newport police station and was in police custody, the police had to obtain a warrant to search it since the vehicle was no longer mobile and capable of disappearing during the warrant application process. At some point before they searched the car, defendant asserts that he was entitled to have the evidence upon which the police based their suspicion tested by an independent magistrate. In the circumstances present here, this argument fails.

■ Where there exists probable cause to search an automobile coupled with exigent circumstances, the police may, without obtaining a warrant, immediately search the car at the location where these conditions co-exist. *Camargo*, 126 N.H. at 770, 498 A.2d at 295–96. Where, however, serious public safety concerns, such as the en-

dangerment of human life and physical well-being, or important law enforcement considerations, such as deterring the escape of a co-conspirator, make it ill-advised to search the car on the road, the police may remove the vehicle to the nearest location where those considerations no longer prevail, such as a police station, and immediately search it there. *Cf. State v. Thompson*, 132 N.H. 730, 732–33, 571 A.2d 266, 268 (1990) (under part I, article 19, usual considerations behind "knock and announce" rule concerning execution of search warrants must give way in certain situations, with one exception existing where circumstances indicate evidence to be seized is likely to be destroyed and another exception existing where police are at physical risk in announcing their presence). What the police did in this case—that is, carry out a warrantless search pursuant to probable cause and exigency—is no more than they are permitted to do under *Camargo*,. and in a situation such as the one before us, the short time lapse before the search took place is not controlling.

 The defendant was not the subject of a *Terry*-type investigative stop. He was arrested without a warrant based on the information that he was committing, in the presence of the police, a felony or felonies, related to the possession and transportation of cocaine. The police had probable cause to both search and arrest. Exigent circumstances prevailed at the highway. The defendant was in custody and not free to use his car. For constitutional purposes we see no difference between a warrantless search conducted at the location where the vehicle is first stopped and a subsequent warrantless search that takes place at another location, so long as the subsequent search is conducted as soon as practicable and is motivated by either safety or law enforcement concerns. *See Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970). Further, in this case, the twenty to thirty minute delay in executing the permissible warrantless automobile search was not unreasonable nor violative of rights secured under part I, article 19. *Cf. United States v. Place*, 462 U.S. 696, 709–10 (1983) (seizure of respondent's luggage for ninety minutes exceeded permissible limits of *Terry*-type investigative stop, under fourth amendment of United States Constitution, where defendant not arrested).

 The State, however, bears the burden, as with other circumstances justifying a warrantless search, of proving by a preponderance of the evidence the presence of public safety or law enforcement factors requiring removal from the location where probable cause and exigency would have allowed a warrantless

search. *See State v. Theodosopoulos*, 119 N.H. at 578, 409 A.2d at 1137. Furthermore, the State must show that the search took place as soon as the public safety concerns or the law enforcement considerations no longer existed.

██ ██ The State presented evidence that the police searched the vehicle within twenty minutes of defendant's arrest. The area underneath the car's backseat was searched at the station approximately ten minutes after defendant's arrest on Maple Street, and the search behind the seat occurred within ten minutes of the search at the station. Here, the police had probable cause to believe that cocaine was hidden in the backseat area, including under and behind it. Within the scope of this justifiable warrantless search they could, therefore, look under the backseat and remove its back support to examine the area behind it. Thus, in the special circumstances of this case, the warrantless search was reasonable within the meaning of part I, article 19 of the New Hampshire Constitution. We note in passing that the scope of this search may be as thorough as a magistrate could authorize in a warrant "particularly describing the place to be searched." *See United States v. Ross*, 456 U.S. 798, 800 (1982) (quoting U.S. CONST. amend. IV).

Finally, we conclude our discussion of the constitutionality of this search by emphasizing that although we look to federal law, specifically *Chambers v. Maroney, United States v. Place*, and *United States v. Ross*, for guidance in interpreting part I, article 19 of the State Constitution, we uphold this warrantless search on the basis of our own interpretation of the New Hampshire Constitution. *State v. Bradberry*, 129 N.H. 68, 73, 522 A.2d 1380, 1382 (1986).

> "[R]ecognizing the renewed vigor of State constitutional analysis, *see* Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 TEX. L. REV. 1141, 1144–48 (1985), [we] ... choose to follow our own path through the labyrinth of search and seizure law. Although [certain] words ... [may] be borrowed from the United States Supreme Court, their interpretation and content [is] for this court in construing part I, article 19."

*Bradberry, supra* at 73, 522 A.2d at 1382.

██ Having determined that the search of defendant's car both at the police station and at the public works garage was reasonable in scope and location, and in the length of its delay after his arrest, we now turn to the defendant's argument that the search at the pub-

lic works garage, during which the police removed the backseat support, was unconstitutional as an improper inventory search. As previously stated, the subsequent search of the defendant's vehicle was merely an extension of the prior search. As such, we reject the defendant's categorization of the subsequent search as an improper inventory search.

During the initial search carried out at the Newport police station, the police could have looked anywhere in the car where they had probable cause to believe the cocaine was located, including under and behind the backseat. Consequently, it is immaterial that the police looked behind the backseat only after moving the car to the garage. The only significance of the subsequent search is the added delay in carrying it out.

Defendant finally claims that his due process rights were violated by the county attorney's request that he waive his right to appeal, in exchange for an unenhanced sentence recommendation. Defendant claimed no State constitutional due process violation below, nor does he cite any section of the State Constitution in his arguments before this court; therefore, we consider his claim as one under the Federal Constitution. *State v. Fowler*, 132 N.H. at 545, 567 A.2d at 560.

■■ It is well settled that a prosecutor may not exercise his or her discretion to bring a criminal charge with the aim of punishing a lawful exercise of the right to appeal. *Blackledge v. Perry*, 417 U.S. 21, 27 (1974) (adopting reasoning of *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), wherein Court held that on retrial, vindictiveness against defendant for having successfully attacked his first conviction must play no part in sentencing). A prosecutor may, however, use the possibility of a further criminal charge as a lever in the process of bargaining for an accused's guilty plea. *Bordenkircher v. Hayes*, 434 U.S. 357 (1978). This court has held that a prosecutor does not offend due process considerations in recommending an enhanced sentence, under RSA 651:6, when the defendant does not plead guilty. *LaVallee v. Perrin*, 124 N.H. 33, 466 A.2d 932 (1983). Plea bargaining involves no punishment for doing what the law allows, *see Pearce, supra* at 738, as long as the accused is free to accept or reject the prosecutor's offer in the course of the "give-and-take" of negotiations, *Bordenkircher, supra* at 363.

The bargain for a waiver of appeal appears to involve "give-and-take" similar, for constitutional purposes, to that present in a plea bargain. The county attorney was not punishing the defendant for retaining his right to appeal, by charging him with new crimes. *See*

*Blackledge, supra* at 363. He had intended well in advance of trial to proceed under RSA 651:6 and had so notified defendant. Rather, in the course of negotiations in which both parties were on equal footing, the prosecutor offered defendant a lesser sentence recommendation in exchange for a waiver of the right to appeal.

 The prosecution had no control over the sentence imposed and was free to recommend an enhanced sentence to the court, given the fact that no bargain had been agreed upon with defendant.

> "[S]entencing, unlike bringing new charges, is the province of the judge. To overturn a conviction or vacate a sentence on the theory that it was tainted by 'vindictiveness' in the prosecutor's . . . recommendation is to suggest that it was the prosecutor not the judge who was running the court . . . . [O]ur adversary system proceeds on the notion that lawyers may often take positions at extreme ends of the spectrum, leaving it to the court to find a proper accommodation in between."

*Koski v. Samaha*, 648 F.2d 790, 797 (1st Cir. 1981). The trial judge plainly "[ran] the court" here. He did not accept the prosecutor's recommendation as to number of years and clearly found a "proper accommodation in between" the parties' recommendations.

*Affirmed.*

All concurred.